[S.F. No. 24793. June 24, 1985.]

SAN JOSE TEACHERS ASSOCIATION, Petitioner, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent;
SANDRA ABERNATHY et al., Real Parties in Interest.

COUNSEL

Diane Ross, Raymond L. Hansen, Kirsten L. Zerger and Ramon E. Romero for Petitioner.

Laurence Gold, Marsha S. Berzon, Michael Rubin, Altshuler & Berzon, Dennis M. Sullivan, Jeffrey Sloan, Robert Thompson and J. Albert Woll as Amici Curiae on behalf of Petitioner.

No appearance for Respondent.

A. Roger Jeanson, Haas & Najarian and David T. Bryant for Real Parties in Interest.

OPINION

**GRODIN, J.**—In July 1981 the San Jose Teachers Association (Association) entered into a three-year collective bargaining agreement with the San Jose Unified School District (District), covering the District's nonmanagement certificated employees. As authorized by California's Educational Employment Relations Act (EERA) (Gov. Code, § 3540 et seq.), the agreement contained a "service fee" provision, requiring every employee either to become a member of the Association or pay the Association "a service fee in an amount equal to unified membership dues, initiation fees, and general assessments payable to the Association." Pursuant to Government Code section 3546, subdivision (a), the service fee provisions of the agreement were voted on and approved by a majority of the members of the bargaining unit at an election conducted and certified by the California Public Employment Relations Board (PERB).

In September 1982 the Association brought suit in the Santa Clara County Superior Court against some 108 members of the bargaining unit who, the complaint alleged, had refused and failed either to join the Association or

to pay the service fee for the 1981-1982 school year. The complaint alleged that the service fee amount due and owing from each defendant was $302 (except for eight defendants, who owed half that amount), and sought judgment for these sums, plus interest from September 1, 1981.

Defendants, by way of answer, objected to paying the sums equal to dues required to be paid by members of the Association, asserting that some portion of the moneys would be used for purposes other than collective bargaining, contract administration, and grievance adjustment purposes including, but not limited to, political and ideological purposes unrelated to collective bargaining. Use of the money for these latter purposes, defendants alleged, would interfere with their rights of free expression and association protected by the First and Fourteenth Amendments to the United States Constitution, under principles announced by the United States Supreme Court in *Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782]. Defendants filed interrogatories, seeking information in support of their claims.

The Association responded with a motion for summary judgment for the full amounts, arguing that defendants' objections were premature. The lesson to be derived from federal cases, the Association contended, is that employees who object to particular expenditures from the equivalent of union dues must nevertheless pay the full amount and assert their objections later, through request for refund.

In support of its motion, the Association submitted a declaration from the executive director of its parent organization, California Teachers Association (CTA), describing rebate procedures which it had adopted. The procedures so described vary from year to year. Under the most recent version, effective beginning with the 1982-1983 year, each entity which receives a portion of the agency fee (the local association, the CTA, and *its* parent organization, the National Education Association (NEA)) computes the "rebateable portion," defined as "that portion of the agency fee which represents political or ideological spending not related to collective bargaining or employment matters." Nonmembers are notified of the net rebateable amount. If a nonmember disagrees with the rebate offered and requests arbitration, the local association is to inform the CTA, which arranges for an arbitration hearing through the American Arbitration Association. Fees of the arbitrator are paid by CTA. Rebate is made based upon the arbitrator's award, with interest from September 30 of the appropriate school year to the date of payment.

Beginning in the 1981-1982 year, CTA established an escrow account in an amount equal to the estimated CTA and NEA agency fee political action rebate for that year. The amount per rebate requested placed in escrow was 8 percent of CTA dues and 13 percent of NEA dues. Similar escrow accounts have been established in succeeding years.

Beginning with the 1983-1984 year, in addition to the rebate procedure, those employees who paid an agency fee in 1982-1983 and requested a rebate were entitled to an offset of the rebate amount against their current agency fee. That is, the amount of the 1983-1984 agency fee collected from them was *reduced* by the amount of the 1982-1983 rebate to which each was entitled. According to the declaration, a similar reduction will also be made in future years.

In addition to the declaration describing the rebate procedures, the Association relied upon California case law to the effect that an action alleging unconstitutional uses of an agency fee must, in the first instance, be brought to the PERB for resolution, since the actions complained of also constitute arguable violations of the EERA. (*Leek* v. *Washington Unified School Dist.* (1981) 124 Cal.App.3d 43 [177 Cal.Rptr. 196]; *Link* v. *Antioch Unified School Dist.* (1983) 142 Cal.App.3d 765 [191 Cal.Rptr. 264].) On these grounds, the Association contended it was entitled to the money "now."

The trial court denied the Association's motion for summary judgment, and the Association sought appellate review through petition for writ of mandate. The Court of Appeal issued an alternative writ but, after hearing, denied the peremptory writ on the merits. We granted petition for hearing in order to consider the complex statutory and constitutional questions thus presented.

I.

When a union brings suit to collect moneys due from public employees pursuant to an agency shop provision of a collective bargaining agreement, what procedures or safeguards are required in order to protect the constitutional rights of those employees who object to use of their contributions for political or ideological purposes, or other purposes unrelated to collective bargaining?[1] That is the principal question presented, and to

---

[1] The AFL-CIO, as amicus curiae, suggests we need not reach this issue because defendants failed to notify the Association of their objection to expenditure of moneys for purposes unrelated to collective bargaining prior to the school year (1981-1982) for which payment is sought to be compelled, and are thus precluded from challenging such expenditure now. (See *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 216, 238 [52 L.Ed.2d 261, 286] ["only employees who have affirmatively made known to the union their opposition to political uses of their funds are entitled to relief"].) Defendants, in response, argue that their objection was made known to the Association in litigation which preceded this action.

answer it requires an understanding of five United States Supreme Court decisions: *Railway Employes' Dept.* v. *Hanson* (1956) 351 U.S. 225 [100 L.Ed. 1112, 76 S.Ct. 714] (*Hanson*); *Machinists* v. *Street* (1961) 367 U.S. 740 [6 L.Ed.2d 1141, 81 S.Ct. 1784] (*Street*); *Railway Clerks* v. *Allen* (1963) 373 U.S. 113 [10 L.Ed.2d 235, 83 S.Ct. 1158] (*Allen*); *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209 (*Abood*); and *Ellis* v. *Brotherhood of Railway etc. Employees* (1984) 466 U.S. 435 [80 L.Ed.2d 428, 104 S.Ct. 1883] (*Ellis*).

It is clear, to begin with, that a statute which authorizes union shop or agency shop agreements does not on that account impinge upon protected rights of association. This was the holding in *Hanson* as to the Railway Labor Act (351 U.S. at p. 238 [100 L.Ed. at p. 1134]; see also *Street,* 367 U.S. at p. 747 [6 L.Ed.2d at pp. 1148-1149]) and in *Abood* as to public employment. "To compel employees financially to support their collective-bargaining representative has an impact upon their First Amendment interests. An employee may very well have ideological objections to a wide variety of activities undertaken by the union in its role as exclusive representative. . . . To be required to help finance the union as a collective-bargaining agent might well be thought, therefore, to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so, as he sees fit. But the judgment clearly made in *Hanson* and *Street* is that such interference as exists is constitutionally justified by the legislative assessment of the important contribution of the union shop to the system of labor relations established by Congress." (*Abood,* 431 U.S. at p. 222 [52 L.Ed.2d at p. 276].) "The governmental interests advanced by the agency-shop provision [in a Michigan statute covering public employees] are much the same as those promoted by similar provisions in federal labor law. The confusion and conflict that could arise if rival teachers' unions, holding quite different views as to the proper class hours, class sizes, holidays, tenure provisions, and grievance procedures, each sought to obtain the employer's agreement, are no different in kind from the evils that the exclusivity rule in the Railway Labor Act was designed to avoid. [Citation.] The desirability of labor peace is no less important in the public sector, nor is the risk of 'free riders' any smaller. . . . [¶] . . . Thus, insofar as the service charge is used to finance expenditures by the Union for the purposes of collective bargaining, contract administration, and grievance adjustment, those two decisions of this Court [*Hanson* and *Street*] appear to

They request that we take judicial notice of the records in a series of individual actions brought by the Association against nonmembers in the San Jose Small Claims Court in the fall of 1980.

Whatever the relative merits of the parties' arguments, the Association did not object in the trial court to the alleged lack of notice. For this reason, the constitutional issues raised by defendants are properly before us.

require validation of the agency-shop agreement before us." (*Abood,* 431 U.S. at pp. 224-226 [52 L.Ed.2d at pp. 277-278].)[2]

It is also clear that employees covered by a union shop or agency shop clause have a right under the First Amendment to object to use of their money for political or ideological purposes which they oppose. In *Street* the court found it possible to avoid the constitutional issue, which it characterized as being of "utmost gravity" (367 U.S. at p. 749 [6 L.Ed.2d at p. 1150]) by construing the Railway Labor Act "to deny the unions, over an employee's objection, the power to use his exacted funds to support political causes which he opposes." (367 U.S. at pp. 768-769 [6 L.Ed.2d at p. 1161].) In *Abood,* since Michigan courts had construed that state's public employee bargaining statute as authorizing use of agency shop fees for political or ideological purposes, the constitutional issue could not be avoided. (431 U.S. at p. 232 [52 L.Ed.2d at p. 282].) In *Buckley* v. *Valeo* (1976) 424 U.S. 1, 22-23 [46 L.Ed.2d 659, 689, 96 S.Ct. 612], the court had held that the freedom to contribute to an organization for the purpose of spreading a message is protected by the First Amendment. In *Abood* the court reasoned: "The fact that appellants are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights. For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State. [Citations.] . . . [¶] These principles prohibit a State from compelling any individual to affirm his belief in God, [citation], or to associate with a political party, [citation], as a condition of retaining public employment. They are no less applicable to the case at bar, and they thus prohibit the appellees from requiring any of the appellants to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher." (431 U.S. at pp. 234-235 [52 L.Ed.2d at p. 284].)

The court in *Abood* acknowledged that "[t]here will, of course, be difficult problems in drawing lines between collective-bargaining activities, for which contributions may be compelled, and ideological activities unrelated to collective bargaining, for which such compulsion is prohibited." (431 U.S. at p. 236 [52 L.Ed.2d at p. 285].) It suggested that in the public sector "the line may be somewhat hazier. The process of establishing a written collective-bargaining agreement prescribing the terms and conditions of public employment may require not merely concord at the bargaining table,

---

[2]The court proceeded in its opinion to consider and reject the arguments by protesting employees that *Hanson* and *Street* should not control in *Abood* because of the distinctive nature of public employment. (431 U.S. at pp. 226-232 [52 L.Ed.2d at pp. 278-282].)

but subsequent approval by other public authorities; related budgetary and appropriations decisions might be seen as an integral part of the bargaining process." (*Ibid.*) But the court found it unnecessary to define the dividing line in that case, which lacked an evidentiary record. (*Ibid.*)

That there are likely to be "difficult problems" in defining the *Abood* dividing line is perhaps an understatement;[3] what concerns us here, however, is the *process* by which the line is to be drawn. For guidance on that question we review the line of cases beginning with *Street* and ending with *Ellis.*

In *Street,* the court held that the objecting employees were not entitled to an injunction against enforcement of the union-shop agreement, since the agreement itself was not unlawful, and the employees "remain obliged, as a condition of continued employment, to make the payments to their respective unions called for by the agreement." (367 U.S. at p. 771 [6 L.Ed.2d at p. 1162].) Moreover, "restraining collection of the funds . . . might well interfere with the appellant unions' performance of those functions and duties which the Railway Labor Act places upon them to attain its goal of stability in the industry." (*Ibid.*) "The complete shutoff of this source of income defeats the congressional plan to have all employees benefited share costs 'in the realm of collective bargaining,' [citation], and threatens the basic congressional policy of the Railway Labor Act for self-adjustments between effective carrier organizations and effective labor organizations." (367 U.S. at p. 772 [6 L.Ed.2d at p. 1163].)

The court in *Street* also expressed the view that "a blanket injunction against all expenditures of funds for the disputed purposes, even one conditioned on cessation of improper expenditures, would not be a proper exercise of equitable discretion." (367 U.S. at p. 772 [6 L.Ed.2d at p. 1163].) Rather, the court suggested that among possible remedies "two may be enforced with a minimum of administrative difficulty and with little danger of encroachment on the legitimate activities or necessary functions of the unions." (*Id.,* at p. 774 [6 L.Ed.2d at p. 1164].) One would be an "in-

---

[3]In *Ellis* the United States Supreme Court confronted the definitional problem in the context of the Railway Labor Act. Avoiding the constitutional problem, as in *Street,* it held that under the statute objecting employees could not be charged for organizing expenses; for litigation expenses not incidental to negotiating and administering the contract or settling grievances and disputes arising in the bargaining unit; for the expenses of publishing a monthly union newspaper insofar as the newspaper reported on activities for which the dissenters could not be charged; nor for death benefits which they did not receive. On the other hand, charges for the union convention and for social activities open to all employees were permissible. (466 U.S. at pp. —— [80 L.Ed.2d at pp. 441-443].)

An unresolved question is whether dissenting employees in the public sector may object on constitutional grounds to expenditures which are *neither* for collective bargaining purposes *nor* for political or ideological purposes.

junction against expenditure for political causes opposed by each complaining employee of a sum, from those moneys to be spent by the union for political purposes, which is so much of the moneys exacted from him as is the proportion of the union's total expenditures made for such political activities to the union's total budget. . . . A second remedy would be restitution to each individual employee of that portion of his money which the union expended, despite his notification, for the political causes to which he had advised the union he was opposed." (367 U.S. at pp. 774-775 [6 L.Ed.2d at p. 1164].) The case was remanded to the district court for selection of an appropriate remedy.

In *Allen,* which was also a Railway Labor Act case, the court confirmed its opposition to the use of the injunctive remedy, holding that plaintiffs who complained of the use of their union shop moneys for political purposes were not entitled to interim relief against compliance with the financial obligations imposed by the agreement. "We think that lest the important functions of labor organizations under the Railway Labor Act be unduly impaired, dissenting employees (at least in the absence of special circumstances not shown here) can be entitled to no relief until final judgment in their favor is entered." (373 U.S. at p. 120 [10 L.Ed.2d at p. 241].) The trial court was directed, upon remand, to determine "(1) what expenditures disclosed by the record are political; (2) what percentage of total union expenditures are political expenditures." (373 U.S. at p. 121 [10 L.Ed.2d at p. 241].) "Since the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion. Absolute precision in the calculation of such proportion is not, of course, to be expected or required; we are mindful of the difficult accounting problems that may arise. And no decree would be proper which appeared likely to infringe the unions' right to expend uniform exactions under the union-shop agreement in support of activities germane to collective bargaining and, as well, to expend nondissenters' such exactions in support of political activities." (373 U.S. at p. 122 [10 L.Ed.2d at pp. 241-242].)

After the trial court performed this accounting task, it was to impose an appropriate remedy, as to which the Supreme Court suggested a "practical decree." (373 U.S. at p. 122 [10 L.Ed.2d at p. 242].) "Such a decree would order (1) the refund to [each plaintiff] of a portion of the exacted funds in the same proportion that union political expenditures bear to total union expenditures, and (2) a reduction of future such exactions from him by the same proportion." (*Ibid.*) The court acknowledged that such a formula would have to be subject to modification over time, and it suggested that "[t]he difficulties in judicially administered relief . . . should, we think,

encourage petitioner unions to consider the adoption by their membership of some *voluntary plan* by which dissenters would be afforded an *internal union remedy.*[4] . . . If a union agreed upon a formula for ascertaining the proportion of political expenditures in its budget, and made available a simple procedure for allowing dissenters to be excused from having to pay this proportion of moneys due from them under the union-shop agreement, prolonged and expensive litigation might well be averted." (373 U.S. at pp. 122-123 [10 L.Ed.2d at p. 242], italics added.)

In *Abood,* after holding that the allegations of the dissenting teachers, if proved, would establish a cause of action for violation of constitutional rights, the court reviewed its discussion of the appropriate remedy under the Railway Labor Act cases and stated: "Although *Street* and *Allen* were concerned with statutory rather than constitutional violations, that difference surely could not justify any lesser relief in this case." (431 U.S. at p. 240 [52 L.Ed.2d at p. 288].) It found "particularly relevant" the suggestion in *Allen* that unions adopt a " 'voluntary plan by which dissenters would be afforded an internal union remedy,' " "for the Union has adopted such a plan since the commencement of this litigation." (*Ibid.* [52 L.Ed.2d at p. 287].) "In view of the newly adopted Union internal remedy," the court concluded, "it may be appropriate under Michigan law, even if not strictly required by any doctrine of exhaustion of remedies, to defer further judicial proceedings pending the voluntary utilization by the parties of that internal remedy as a possible means of settling the dispute." (431 U.S. at p. 242 [52 L.Ed.2d at p. 289].)

The internal union remedy to which the court referred in *Abood* is described in a footnote to the opinion: "Under the procedure adopted by the Union, as explained in the appellees' brief, a dissenting employee may protest at the beginning of each school year the expenditure of any part of his agency-shop fee for ' "activities or causes of a political nature or involving controversial issues of public importance only incidentally related to wages, hours, and conditions of employment." ' The employee is then entitled to a pro rata refund of his service charge in accordance with the calculation of the portion of total Union expenses for the specified purposes. The calculation is made in the first instance by the Union, but is subject to review by an impartial board." (431 U.S. at p. 240, fn. 41 [52 L.Ed.2d at p. 287].)

It would appear from *Abood* that the court tacitly approved the internal union remedy which it described, but its recent opinion in *Ellis* creates doubt concerning that, or indeed any, remedy relying on rebate alone. In

---

[4]The court noted there was precedent for such a plan under the British Trade Union Act of 1913, 2 & 3 Geo. V, chapter 30. (373 U.S. at p. 123, fn. 8 [10 L.Ed.2d at p. 242].)

that case, brought by dissenting employees under the Railway Labor Act, the union had established a "rebate program" under which, as cryptically described in the opinion, "objecting employees were ultimately reimbursed for their share of union expenditures on behalf of political and charitable causes." (466 U.S. at p. — [80 L.Ed.2d at p. 437].)[5] The Supreme Court acknowledged that language in *Street, Allen,* and *Abood* "support[s] the validity of a rebate program," but observed: "Those opinions did not, nor did they purport to, pass upon the statutory or constitutional adequacy of the suggested remedies. Doing so now, we hold that the *pure rebate approach* is inadequate. [¶] By exacting and using full dues, then refunding months later the portion that it was not allowed to exact in the first place, the union effectively charges the employees for activities that are outside the scope of the statutory authorization. The cost to the employee is, of course, much less than if the money was never returned, but this is a difference of degree only. The harm would be reduced were the union to pay interest on the amount refunded, but respondents did not do so. Even then the union obtains an involuntary loan for purposes to which the employee objects. [¶] The only justification for this union borrowing would be administrative convenience. But there are *readily available alternatives, such as advance reduction of dues and/or interest-bearing escrow accounts,* that place only the slightest additional burden, if any, on the union. *Given the existence of acceptable alternatives, the union cannot be allowed to commit dissenters' funds to improper uses even temporarily.* A rebate schedule reduces but does not eliminate the statutory violation." (466 U.S. at p. — [80 L.Ed.2d at p. 439], italics added.)

## II.

Though *Ellis* arose under the Railway Labor Act, the court's reservations about the adequacy of a "pure rebate" approach would appear equally applicable to the constitutional context of *Abood,* and two federal circuit courts have so held. (*Robinson* v. *State of New Jersey* (3d Cir. 1984) 741 F.2d 598; *Hudson* v. *Chicago Teachers Union Local No. 1* (7th Cir. 1984) 743 F.2d 1187.) The question in both cases was what sort of procedures are adequate to satisfy the Supreme Court's concerns.

---

[5]The circuit court's opinion provides a fuller description. "Pursuant to [the Supreme Court's suggestion in *Allen,* the Union] instituted a voluntary rebate plan in late 1975. Under the program, a protesting employee receives a rebate on his or her pro rata share of all union disbursements for political and ideological activity as well as all legislative and lobbying costs, charitable donations, and fees for affiliations with other labor organizations. The Grand Lodge computes the rebate based on information submitted by subordinate units and on reports submitted by Grand Lodge personnel concerning time and funds spent for political and ideological purposes. Any employee who believes his or her rebate inadequate may appeal directly to an independent Public Review Board authorized to make final determinations on such appeals." (*Ellis* v. *Broth. of Ry., Airline & S. S. Clerks* (9th Cir. 1982) 685 F.2d 1065, 1069.)

In *Robinson,* groups of public employees challenged provisions of a New Jersey statute which authorized certified unions to collect from nonmembers a "representation fee" in an amount equivalent to regular membership dues, initiation fees and assessments, but less the cost of benefits available only to members, and limited to 85 percent of what members were required to pay. The statute also provided that any public employee who paid a representation fee had the right to demand and receive from the union " '. . . a return of any part of that fee paid by him which represents the employee's additional pro rata share of expenditures by the majority representative that is either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment or applied to the cost of any other benefits available only to members of the majority representative.' " (741 F.2d at p. 602.) In order to receive representation fees automatically through dues checkoff, unions were required to establish a "demand and return system" which allowed for review of the amount returned " 'through full and fair proceedings placing the burden of proof on the majority representative.' " (*Ibid.*)

One issue before the court of appeals in *Robinson* was the adequacy, under *Ellis,* of three claim-and-return systems which had been established under the New Jersey statute. Under one system, used by local affiliates of the NEA, when a dissenting employee sent the union an "objection letter," the union automatically placed in escrow an amount equivalent to what an independent auditor determined was the amount spent the previous year on noncompulsory representation matters. Once each year a member of the National Academy of Arbitrators, acting as arbitrator, determined the actual amount for that year.[6] A second procedure, utilized by the American Association of University Professors, granted an "advance rebate" equal to a pro rata share for *anticipated* noncompellable expenses, with year-end adjustments following an auditor's report. A third organization, the Communications Workers of America, maintained a more sophisticated procedure which called for automatic escrow of 40 percent of the agency fee, an amount which, according to its accounting procedures, closely approximated the amount to which objection could properly be made.

The district judge in *Robinson* concluded that *no* demand-and-return system could protect an objecting nonmember's First Amendment rights, which included the right to bestow his funds upon an alternative political view and the right not to make an involuntary loan to the union for political purposes to which he objects. The court of appeals disagreed. Noting that "[w]here the obstacle to free expression is the temporary deprivation of money, rather than a prohibition of access to a forum, the Supreme Court has allowed far

---

[6]The opinion does not state by what procedure an adjustment is made.

greater leeway to challenged state procedures" (741 F.2d at p. 611), and reasoning that even if "some cognizable harm occasioned by the temporary deprivation of a small amount of returnable fees exists, adequate post-deprivation procedures may suffice to withstand the constitutional challenge" (*ibid.*), the court concluded that, "standing alone, the deprivation of the non-consenting employee's ability to contribute the withheld funds to an alternative political view does not constitute a First Amendment violation. Rather, the question is one of the due process protections in the assessment of the withholding and the adequacy of the post-withholding return systems." (*Id.*, at p. 612.)

The court of appeals in *Robinson* then turned to the First Amendment issue identified in *Ellis*—the involuntary loan—and interpreted the Supreme Court's opinion in *Ellis* as approving "either an advance reduction of dues or the placing of contested funds in an interest-bearing escrow account." (741 F.2d at p. 612.) The court characterized the challenged procedures in *Robinson* as incorporating "both of the protective mechanisms approved by *Ellis*. By statute, there is a fifteen percent differential between the amounts chargeable to fee payers and the union dues of full union members; . . . In addition, each of the defendant-unions has created an escrow system for a portion of the representation fee. In order for the representation fees collected by the unions to be susceptible to constitutional challenge, therefore, the expenditures for political and ideological activities by them must exceed the sum of the fifteen percent statutory 'cushion' and the amount escrowed by the union." (*Ibid.*) An examination of the demand and return systems which the defendant unions had adopted "reveals that the principal protections required by *Ellis* and the *Mathews* [*Mathews* v. *Eldridge* (1976) 424 U.S. 319 (47 L.Ed.2d 18, 96 S.Ct. 893)] due process case law are already in existence." (741 F.2d at p. 613.) Thus, the court held that the district judge was in error in rejecting the unions' demand-and-return systems out of hand, and directed him on remand to "examine these systems to determine whether the escrow procedures satisfy the *Ellis* requirement that the unions not be in a position to extract a forced loan from non-consenting employees." (*Id.*, at p. 614.)[7] Meanwhile, in light of previous Supreme

---

[7]Defendants argue that *Ellis* requires advance reduction of fees in *every* case; that where an escrow account is used, *Ellis* requires that the *entire* fee be placed in escrow until the union proves the precise *Abood* amount; and that, in any event, "an escrow account is not appropriate here because the union is not entitled to anything until it proves its case at trial."

Defendants' first contention conflicts with the express language of *Ellis* which states that "advance reduction of dues *and/or* interest-bearing escrow accounts" are permissible. (466 U.S. at p. — [80 L.Ed.2d at p. 439], italics added.) Defendants' second and third assertions contradict one another—in one breath defendants argue that the entire disputed amount must be placed in escrow *while* litigation over the *Abood* amount is pending, and in the next breath defendants contend that no escrow account can be established until *after* the litigation

Court declarations concerning the impropriety of injunctive relief in such cases, as well as the improbability of actual harm to the plaintiffs, the court held that the injunction previously granted by the district judge should be lifted, and the unions permitted to obtain their representation fees on the basis of the statutory "cushion" and their own escrow systems, pending litigation.

In *Hudson* v. *Chicago Teachers Union Local No. 1, supra,* 743 F.2d 1187, the Seventh Circuit Court of Appeals has adopted a somewhat different view of what the federal Constitution requires. The case involved suit by nonunion employees of the Chicago Board of Education and the Chicago Teachers Union under section 1 of the Civil Rights Act of 1871 (42 U.S.C. § 1983) objecting to an agency fee provision contained in a collective bargaining agreement between those parties. The focus of their objection was the procedure for determining how much should be deducted. When the provision was negotiated in 1982, the union calculated the percentage of its expenditures it believed to represent the costs of negotiating or administering the first contract, and set that at 95 percent. On the basis of that calculation, it set the agency fee at 95 percent of dues, and asked the board to deduct and transmit that percentage. An objecting nonunion member had 30 days after the agency fee was first deducted to file an objection with the union. If the union's executive committee rejected the claim, the objector could request arbitration before an arbitrator selected by the union president from a list of arbitrators accredited by the state board of education. The union pays the arbitration fee, and the arbitrator's decision is final. If the arbitrator finds the union entitled to less than 95 percent, the objecting employee gets a refund and a reduction in future agency fee payments, and other employees get a reduction in future agency fee payments as well.

The court found this procedure to be constitutionally objectionable. "The most conspicuous feature of the procedure is that from start to finish it is entirely controlled by the union, which is an interested party. . . . [¶] The problem would not be so serious if there were an independent arbitrator at the end if not at the beginning of the process. But the arbitrator is picked by the union. . . ." (743 F.2d at pp. 1194-1195.) A constitutionally adequate procedure, the court suggested, would be one in which there was "fair notice, a prompt administrative hearing before the Board of Education or

is complete.
   Taken individually, these assertions are no more meritorious. It would make little sense for the court in *Ellis* to allow the union to make an advance reduction of the fee based on its estimate of the *Abood* amount yet require that if an escrow account is used, the union must place in escrow the *entire* fee, thereby prohibiting the union from using *any* of the funds. And surely the *Ellis* court did not mean that an escrow account may be established only after the union had proved its case at trial—once the union "proves its case," there is no need for an escrow account.

some other state or local agency . . . and a right of judicial review of the agency's decision. The combination of an internal union remedy and an arbitration procedure is unlikely to satisfy constitutional requirements given the nature of the issues to be decided and the union's stake in how they are decided." (*Id.*, at p. 1196.)

In *Champion* v. *State of Cal.* (9th Cir. 1984) 738 F.2d 1082, the Ninth Circuit upheld, against constitutional attack, the provisions of California's State Employer-Employee Relations Act (Gov. Code, § 3512 et seq.) which authorize deduction and transmittal to an exclusive bargaining representative of a "fair share fee" subject to a claim and rebate procedure. Under that procedure the employee has the right to demand and receive from the representative a return of any part of the fee which is spent "either in aid of activities or causes of a partisan political or ideological nature only incidentally related to the terms and conditions of employment, or applied towards the cost of any other benefits available only to members of the recognized employee organization." (Gov. Code, § 3515.8.)[8] The California State Employees Association adopted a policy of eliminating from the deduction the amount it determines is spent for political or ideological purposes, rather than waiting to refund, but employees within a bargaining unit covered by that organization's collective bargaining agreement sought a preliminary injunction, in federal court, against the deduction and collection of any portion of plaintiffs' wages as fair share fees. The district court denied plaintiffs' motion for a preliminary injunction, and the Ninth Circuit affirmed.

The circuit court's opinion distinguishes *Ellis,* stating: "The Supreme Court rejected [a rebate plan] approach, holding that once the amount of unauthorized expenditures has been determined, that amount must be deducted from the fair share fee. It held that a rebate scheme does not adequately protect the nonconsenting employees' rights. [Citation.] [¶] The *Ellis* holding does not determine the validity of the California statute authorizing a fair share deduction nor the disposition of this appeal. In this case, we face the problems that *Allen* and *Street* recognized in considering broad preliminary relief. In contrast, *Ellis* was decided on a fully developed record and controls only the remedy after a final judgment on the merits. See *Allen,* 373 U.S. at 120. Moreover, as the rebate is a separate and distinct part of

[8]The balance of section 3515.8 provides: "The pro rata share subject to refund shall not reflect, however, the costs of support of lobbying activities designed to foster policy goals and collective negotiations and contract administration, or to secure for the employees represented advantages in wages, hours, and other conditions of employment in addition to those secured through meeting and conferring with the state employer. The board may compel the recognized employee organization to return that portion of a fair share fee which the board may determine to be subject to refund under the provisions of this section."

the California scheme, its invalidity should not affect the constitutionality of the statute as a whole. Nor would it affect any voluntarily adopted procedure such as CSEA has described whereunder the Association forgoes the initial collection of the amounts that it might otherwise be required to rebate under the statute." (*Champion, supra,* 738 F.2d at p. 1086.)

The Ninth Circuit's narrow reading of *Ellis* finds support in recent action by the Supreme Court dismissing appeals in two Michigan cases "for want of a substantial federal question": *Kempner* v. *Local 2077, AFL-CIO* (1984) — U.S. — [83 L.Ed.2d 254, 105 S.Ct. 316]; and *Jibson* v. *White Cloud Ed. Assn.* (1984) — U.S. — [83 L.Ed.2d 176, 105 S.Ct. 236].

In *Kempner,* a city employee refused to pay the agency shop service fees required by the agreement between her employer and a union, and the union requested the city to terminate her employment. Thereafter, the union offered to accept a 6 percent reduction in the service fee—an amount which it acknowledged was used for political or ideological purposes unrelated to collective bargaining—but the employee still refused to make any payment, except into an escrow account, pending an adjudication as to the proper allocation of the service fee. She also declined to use the union's internal rebate procedure. Charges were filed on her behalf with the Michigan Employment Relations Commission seeking restraint of her discharge pending an adjudication of the *Abood* amount. The commission refused to entertain the complaint, however, until the employee paid the reduced fee to the union and exhausted the union's rebate procedure; and the Michigan Court of Appeal affirmed. (*Kempner* v. *Local 2077, AFL-CIO* (1983) 126 Mich. App. 452 [337 N.W.2d 354].) To allow withholding of agency shop fees pending adjudication of the *Abood* amount, it reasoned, would force the union to be "obligated to fulfill its ongoing statutory responsibilities to the entire bargaining unit—including the charging party-appellant—without corresponding financial sustenance." (*Kempner, supra,* 337 N.W.2d at p. 358.) The employee's jurisdictional statement to the Supreme Court relied upon *Ellis,* and argued that the Michigan court's ruling interfered with her rights under both the First Amendment and the due process clause.

In *White Cloud* the dissenting employee, Jibson, was a school teacher who refused to pay his agency shop fees for the 1977-1979 school years. When the board of education refused to fire him, as the union requested, the union brought suit against the board to force his dismissal. The trial court ordered the board to fire Jibson if it determined that the fee had not been paid. The employees then moved to intervene, contending that he should not be required to pay his past-due agency shop fees until *after* the union proved the precise *Abood* amount. The trial court agreed to permit intervention for the purpose of conducting an *Abood* hearing, but it condi-

tioned Jibson's right to such a hearing on his *first* paying the full amount of the contested agency shop fee to the union, rejecting Jibson's proposal to pay it into escrow instead.

The Michigan Court of Appeals affirmed, holding "that the employee's First Amendment rights can be adequately safeguarded if the disputed fee is paid to the union and the employee immediately files suit for declaratory judgment." (*White Cloud Ed. Ass'n* v. *Bd. of Ed., etc.* (1980) 101 Mich. App. 309 [300 N.W.2d 551, 555].) "In this manner," the court asserted, "while the employee can quickly move for a resolution of the issue and a vindication of his constitutional rights, the union is not crippled by nonaccess to that portion of the fee which will be used for collective bargaining, contract administration and grievance adjustment." (*Ibid.*) When the Michigan Supreme Court denied Jibson's application for leave to appeal, Jibson filed an appeal as of right to the United States Supreme Court, contending that any agency-shop arrangement that permits "even *temporary* use of coerced monies for impermissible purposes" violates the dissenting employee's First Amendment rights. Relying upon *Ellis,* Jibson argued: "A court-determined post-spending refund is no less a forced loan than one administered by a union."

■ A summary disposition by the United States Supreme Court, while not binding upon that court, carries full precedential authority for other courts, including state supreme courts. (E.g., *Metromedia, Inc.* v. *San Diego* (1981) 453 U.S. 490, 499-500 [69 L.Ed.2d 800, 810, 101 S.Ct. 2882] (plur. opn.), revg. in part and remanding in part *Metromedia, Inc.* v. *City of San Diego* (1980) 26 Cal.3d 848, 867 [164 Cal.Rptr. 510, 610 P.2d 407]; see also *Mandel* v. *Bradley* (1977) 432 U.S. 173, 176 [53 L.Ed.2d 199, 204-205, 97 S.Ct. 2238].) The precedential weight of such decisions should be confined, however, to the narrowest possible grounds.

■ Defendants respond to *Kempner* and *White Cloud* by asserting that "[t]he records in the Supreme Court cases did not contain the same quantum of evidence which is currently before the court showing that the union is not entitled to the amount which it claims." The distinction is dubious, however. In *Kempner,* it was assumed that the amounts spent by the union in that case for impermissible purposes might exceed the 6 percent figure by which the union offered to reduce its demand. The decision of the Michigan Employment Relations Commission, which the court of appeal affirmed, required only that in making the computation "'the Union must use its own definition of ideological or political purpose as long as that definition is a good faith application of current case law.'" (337 N.W.2d at p. 356.) In *White Cloud* the dissenting employee was required to pay the full amount of the service fee as a condition to retaining her employment, and the union

did not contend that no portion of that amount was allocated to ideological or political purposes.

Rather, it appears from its opinions in *Abood* and *Ellis* and from its dismissals in *Kempner* and *White Cloud* that what the United States Supreme Court is seeking is a practical accommodation between the competing interests which are at stake. Dissident employees have a right not to finance political or ideological purposes to which they object, and a system which requires them to contribute the full amount of regular membership dues and fees, without reduction or escrow, and subject to a long and possibly illusory rebate procedure, will not suffice. On the other hand, if the union makes a good faith effort to estimate the *Abood* amount and provide a reduction for the overage, as in *Kempner,* or if there exists a procedure for reasonably prompt and efficient determination of the *Abood* amount, as in the declaratory judgment procedure suggested in *White Cloud,* constitutional requirements will not be deemed violated by minor departures from exactitude.

If the agency shop clause in this case had been of the classic variety, i.e., dependent upon removal from employment for its enforcement, employees seeking to enjoin its enforcement would not be entitled to such relief, at least absent a showing that the amounts computed by the union and placed in escrow (or offset against the agency fee) were unreasonably low, or that the rebate procedures adopted by the union were unfair. Defendants make no such showing here.[9]

Defendants argue, however, that the result must be different when it is the union that is seeking relief, in the form of a summary judgment for a specific amount. It is to this issue that we now turn.

[9]We note that during the pendency of this matter PERB has rendered an opinion holding that the advanced reduction and " 'escrow' " mechanisms which have been established by CTA "appear to offer at least the minimum protections required by the United States Supreme Court in Ellis v. Railway Clerks." (*Antioch Unified School District (David W. Link)* (1985) PERB Order No. IR-47, p. 6.) The board did question the union's unilateral management of the escrow account, as well as the rate of interest (7 percent) being paid on that account, and held that these aspects of the CTA system presented an arguably unfair labor practice under EERA. It concluded, however, that in the absence of evidence or contention that the escrow account was being mismanaged, there was no deprivation of constitutional right nor of statutory violation warranting injunctive relief. Accordingly, it denied the requests of dissident teachers in three school districts that the board seek injunctive relief requiring escrow of all or a greater amount of agency fees pending determination of their unfair practice charges which alleged that the agency fee they were required to pay exceeds the amount permissible under the federal Constitution and the state statute.

In the *Antioch* case the dissenting employees argued that the *internal* arbitration procedures which the union had established for determination of the *Abood* amount were inadequate because those procedures were under the union's control. PERB held that the appropriateness of the arbitration procedures was not an issue because PERB did not require exhaustion of those procedures as a condition to the exercise of its jurisdiction. (*Id.,* at pp. 20-21, fn. 21.)

### III.

The traditional means of enforcing payment of union shop or agency shop fees required by a collective bargaining agreement is through the threat of termination from employment. Some organizations representing employees under the EERA, however, have chosen to negotiate organizational security provisions without making payment a condition of continued employment. In *San Lorenzo Education Assn.* v. *Wilson* (1982) 32 Cal.3d 841, 844 [187 Cal.Rptr. 432, 654 P.2d 202], we held that such a provision is proper under the EERA, and that "civil suit is a proper and often preferred method of enforcing such a provision." Such a provision, and such a civil suit, are the background to this dispute.

■ Defendants contend that "[t]his case arrived in a fundamentally different posture than *Street, Allen* and *Abood* and that difference is fatal to the [Association's] legal position." In essence, defendants argue that the series of Supreme Court cases just discussed stand for the proposition that, where the *Abood* amount is challenged, a plaintiff in an agency fee action may not obtain relief until a final determination of the *Abood* amount has been made by a court. Since the union is the plaintiff seeking relief in this case, defendants argue, it must await a final determination of the *Abood* amount before recovering any portion of the fee. Defendants misconstrue the Supreme Court rulings.

It is true that in *Street, Allen* and *Abood*[10] the dissenting employees were the plaintiffs seeking injunctive relief from the court. However, it was their status as employees—not their status as plaintiffs—which supported the court's holding that they must "pay first and complain later." The court was concerned that if employees were allowed to withhold agency fees pending litigation of the *Abood* amount, the union would be unable adequately to perform its vital role in the collective bargaining system. Thus, in *Street* the court stated that "restraining collection of the funds . . . might well interfere with the appellant unions' performance of those functions and duties which the Railway Labor Act places upon them to attain its goal of stability in the industry." (367 U.S. at p. 771 [6 L.Ed.2d at p. 1162].) Similarly, in *Allen* the court stated, "We think that lest the important functions of labor organizations under the Railway Labor Act be unduly impaired, dissenting employees (at least in the absence of special circumstances not shown here) can be entitled to no relief until final judgment in their favor is entered." (373 U.S. at p. 120 [6 L.Ed.2d at p. 241].) (See also

---

[10]Contrary to defendants' contention, the right of employees to withhold payment of an agency fee while litigating the *Abood* amount was neither raised nor addressed by the court in *Abood.*

*Kempner, supra,* 337 N.W.2d at p. 358 [holding it was insufficient for employee to place agency fees in escrow pending resolution of *Abood* amount because the union would "be obligated to fulfill its ongoing statutory responsibilities to the entire bargaining unit—including the charging party-appellant—without corresponding financial sustenance"]; and *White Cloud, supra,* 300 N.W.2d at p. 555 [holding that dissenting employees must pay fees first and then seek declaratory relief because otherwise the union might be "crippled by nonaccess to that portion of the fee which will be used for collective bargaining, contract administration and grievance adjustment"].)[11] Were we to permit defendants in this case to withhold payment of all fees pending litigation of the *Abood* amount, we would be sanctioning a form of "self-help injunction," contrary to the very concerns expressed by the Supreme Court in *Steel* and *Allen.*[12]

Thus, contrary to defendants' contention, *Street* and *Allen* do not establish a general rule of procedure limiting the relief available to plaintiffs in actions concerning agency shop fees. Rather, these cases establish a specific rule of substantive law. As the Ninth Circuit recently observed: "[T]he Supreme Court very clearly held [in *Street* and *Allen*] that protesting employees are not released from their dues-paying obligation simply because they believe that a portion of their dues is being used for political or ideological expenditures." (*Dean* v. *Trans World Airlines, Inc.* (9th Cir. 1983) 708 F.2d 486, 487, cert. den. 464 U.S. 995 [78 L.Ed.2d 685, 104 S.Ct. 490]; see also *Browne* v. *Milwaukee Bd. of Sch. Directors* (1978) 83 Wis.2d 316, 340 [265 N.W.2d 559, 570].)

When read in conjunction with the Supreme Court's recent decision in *Ellis* (and its dismissals in *Kempner* and *White Cloud*), *Steel* and *Allen* seem to stand for the proposition that a union is entitled to collect, and an employee is obligated to pay the full agency fee, even though some portion of

---

[11]Significantly, in *White Cloud* the union sued the board of education to force the dismissal of a teacher who refused to pay the agency fee, and the teacher intervened, contending that he should not be required to pay his past-due agency fees until after the union proved the precise *Abood* amount. Thus, the teacher in *White Cloud* was in essentially the same procedural posture as the defendants in this case. Yet the court, in agreeing to permit intervention for the purposes of conducting an *Abood* hearing, conditioned the teacher's right to such a hearing on his first paying the full amount of the contested agency shop fee. (300 N.W.2d at p. 555.)

[12]The requirement that dissenting employees continue to pay their fees while they litigate their challenges to the amount collected is similar to the requirement that citizens who question the validity of taxes assessed against them must "pay first and complain later." The policy justification for this rule in the tax context is very similar to the policies expressed by the court in *Steel* and *Allen*. As this court has stated, " 'The prompt payment of taxes is always important to the public welfare. It may be vital to the existence of a government. The idea that every tax-payer is entitled to the delays of litigation is unreason[able]. . . .' " (*Modern Barber Col.* v. *Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 726 [192 P.2d 916].)

that fee will exceed what, at year's end, is determined to be the precise *Abood* amount, as long as the union places in escrow (or deducts in advance) that portion of the dissenting employees' fees which the union reasonably estimates would otherwise be spent for political or ideological purposes, and provides a fair procedure for determining and rebating any amount in excess of the actual *Abood* amount. This is so because, as the court stated in *Street,* the dissenting employees' "grievance stems from the *spending* of their funds for purposes not authorized by the Act in the face of their objection, not from the enforcement of the union-shop agreement by the mere *collection* of funds." (367 U.S. at p. 771 [6 L.Ed.2d at p. 1162], italics added.) By placing a portion of the employees' fees in an escrow account, the union renders itself unable to spend those funds. Thus, the employees' First Amendment (and statutory) right not to have their fees *spent* for political or ideological purposes is protected. At the same time, the union will have access to that portion of the funds which it reasonably estimates to be the *Abood* amount, i.e., the amount the union may properly spend for purposes reasonably related to its role as the employees' agent.

■ ■■■ ■ ■ We conclude that because a union whose collection procedures meet the requirements of *Ellis* is entitled to collect the *entire* fee, regardless of what is ultimately determined to be the *Abood* amount, the actual *Abood* amount is not at issue in an action brought by a union to collect its agency fees and, therefore, does not constitute a triable issue of material fact precluding summary judgment.[13] Any dispute as to the *Abood* amount may be made the subject of a collateral proceeding. We turn now to the question whether that collateral proceeding should be in court, or before PERB.

### IV.

This court, applying familiar principles of agency preemption, has held that conduct which is alleged in a judicial proceeding to be unlawful must

---

[13]For this reason, also, we reject defendant's contention based on *Vargas* v. *Municipal Court* (1978) 22 Cal.3d 902 [150 Cal.Rptr. 918, 587 P.2d 714] that due process requires the trial court to consider and rule upon their "defense" to the Association's collection action. In *Vargas* this court stated that a municipal court's jurisdiction in an unlawful detainer action extends not only to the complaints but to the tenant's defense to the complaint as well, and that "the essential fairness and basic integrity required of a judicial proceeding by due process is clearly violated if only one party to the controversy is permitted to present evidence related to the matters at issue." (22 Cal.3d at p. 915.) However, as we have explained, a union is entitled to collect the full agency fee *regardless* of what is ultimately determined to be the *Abood* amount; thus, defendants' challenge to the *Abood* amount constitutes neither a "defense" to the union collection nor a "matter at issue." For this reason, there is no merit to defendants' further concern that under Code of Civil Procedure section 431.30 they will waive their right to litigate the *Abood* issue if they do not raise it in the union's collection action, or that they will be precluded from asserting it by principles of res judicata or collateral estoppel.

first be heard by PERB where the conduct is arguably protected or prohibited by the EERA and where PERB could furnish relief equivalent to that which could be provided by the court. (*San Diego Teachers Assn.* v. *Superior Court* (1979) 24 Cal.3d 1, 9, 12 [154 Cal.Rptr. 893, 593 P.2d 838]; see also *El Rancho Unified School Dist.* v. *National Education Assn.* (1983) 33 Cal.3d 946, 959-961 [192 Cal.Rptr. 123, 663 P.2d 893].) In two cases in which dissident employees were the plaintiffs, the Court of Appeal has held that disputes which involve the collection and use of agency fees from nonmembers concern conduct arguably protected or prohibited by the EERA and thus must initially be adjudicated by PERB.

In *Leek* v. *Washington Unified School Dist., supra,* 124 Cal.App.3d 43, nonmember teachers complained of an agency shop agreement between the district and the local teachers' association on both statutory and constitutional grounds. In their first two causes of action, plaintiffs complained that it was a violation of the EERA to require them to make any payments to the local association's parent bodies, the CTA and NEA. In the third cause of action, plaintiffs alleged that it was a violation of the due process clauses of both the United States and California Constitutions to require them to pay fees to various organizations and at the same time to deprive them, because of their status as nonmembers, of the right to vote on how the dues should be spent as well as of the right to particularized benefits from expenditures not directly and necessarily related to the collective bargaining and contract administration process. The fourth and fifth causes of action complained of constitutional violations on the theory of *Abood.*

The *Leek* court found that the first two causes of action "allege violations of the EERA and as such are within the investigatory power of PERB, pursuant to section 3541.3, subdivision (i),"[14] and that the allegations of the third cause of action, "[t]hough couched in a constitutional context . . .

---

[14] Section 3541.3, subdivision (i), grants the board authority "[t]o investigate unfair practice charges *or alleged violations of this chapter,* and take such action and make such determinations in respect of such charges or alleged violations as the board deems necessary to effectuate the policies of this chapter." (Italics added.) Subdivision (h) of section 3541.3 empowers the board to hold hearings, and subdivision (j) permits the board to enforce its decision or ruling by bringing an action in a court of competent jurisdiction. Finally, subdivision (n) empowers the board "[t]o take such other action as the board deems necessary to discharge its powers and duties and otherwise to effectuate the purposes of this chapter."

Relying upon these provisions, the court in *Leek* held it did not matter whether the union conduct of which the dissident employees complained constituted an unfair labor practice under the EERA. It reasoned: "While it was appropriate for the court in *San Diego Teachers Assn., supra,* (24 Cal.3d 1) to focus upon whether the strike therein could be considered an unfair practice, we determine the appropriate preliminary question in this case is whether the matters complained of could constitute either unfair practice charges or alleged violations of the EERA." (124 Cal.App.3d at p. 49.) It noted that in *San Diego Teachers Assn.,* we said " 'EERA specifies no "unfair practices" but only acts that are "unlawful" (§§ 3543.5, 3543.6) and thus does not segregate unfair practices from other violations.' " (*Ibid.*)

plausibly constitute unfair practices under section 3543.6, subdivision (b)."[15] (124 Cal.App.3d at p. 51.) It reasoned that a ruling by PERB on the third cause of action could "resolve the alleged constitutional violations alleged in the third, fourth, and fifth causes of action," and that in any event plaintiffs would be required to exhaust administrative remedies prior to making the constitutional challenge. (*Id.*, at p. 52.) Moreover, it held that the board could plausibly provide relief functionally equivalent to that available in a court action. (*Ibid.*) Thus, the *Leek* court concluded that plaintiffs' suit was properly dismissed in the trial court for failure to exhaust administrative remedies. (*Id.*, at p. 54.)

In *Link* v. *Antioch Unified School Dist., supra,* 142 Cal.App.3d 765, plaintiff nonmembers complained of the service fee on exclusively constitutional grounds. The Court of Appeal, affirming dismissal for failure to exhaust remedies before PERB, accepted the *Leek* court's analysis and added: "Looking beyond the constitutional label given to plaintiffs' grievances herein [citation], the substance of conduct complained of may also constitute unfair practices which arguably could be resolved by a PERB ruling. By investing the PERB with broad investigative and remedial powers, the Legislature intended that the PERB exercise initial jurisdiction over those nominal constitutional violations. PERB might validly devise a method to allow plaintiffs to avoid payment for those political and ideological activities they find constitutionally objectionable without restricting the unions' ability to require plaintiffs to contribute to the collective bargaining and grievance activities. Referring this dispute to PERB first would promote the Legislature's purpose in creating an expert administrative body whose responsibility it is to develop and apply a comprehensive, consistent scheme regulating public employer-employee relations." (142 Cal.App.3d at p. 769.)

Since *Leek* and *Link* were decided, the PERB has made clear its view that disputes concerning the *Abood* amount, as well as disputes concerning the adequacy of union escrow and rebate procedures under *Ellis,* pose statutory questions within the agency's jurisdiction. In *King City Joint Union High School District* (1982) PERB Order No. 197 [6 PERB ¶ 13065], the board held that compelled contribution of funds for purposes beyond the collective bargaining-representation function is not permissible under the EERA. The board's opinion in that case does not clearly come to grips with the question whether such compulsion constitutes an unfair labor practice, but more recently the board has issued unfair practice complaints on charges that col-

---

[15]Section 3543.6, subdivision (b), makes it ". . . unlawful for an employee organization to . . . [i]mpose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter."

lection of an agency fee in excess of amounts permissible under the federal Constitution and the EERA constitutes interference with the statutory right not to participate in union activities (§ 3543), and therefore constitutes an unlawful labor practice on the part of both the school district (§ 3543.5, subd. (a)) and the employee organization (§ 3543.6, subds. (a) & (b)). (See *Antioch Unified School District (David W. Link), supra,* PERB Order No. IR-47.) PERB has also expressed the view that the EERA, like the federal Constitution, requires a collection procedure which is adequate to protect the interests of nonmembers in not extending an involuntary loan to the union. (*Id.,* at pp. 17, 20.) These positions by the agency charged with administration of the statute tend to reinforce the view of the Court of Appeal in the *Leek* and *Link* cases.

We agree with the Court of Appeal's view in those cases. Because of its expertise PERB is clearly in a better position than a court to decide, in the first instance, which activities are reasonably related to a union's collective bargaining function and which are not. Moreover, requiring that these issues be litigated first before PERB will further the strong policy of promoting uniformity in the substantive law, remedies and administration of the EERA. (*El Rancho Unified School Dist., supra,* 33 Cal.3d at p. 960.)

The same appellate court which decided *Leek* and *Link* arrived at a contrary result in this case, reasoning that "[t]o require nonmembers to submit to judgment in a civil action and then to pursue remedies before the PERB as to the amount properly due would surely increase rather than decrease potential procedural redundancy, would not appreciably lighten the load on the court which already had Union's lawsuit before it, and would not make efficient use of the PERB's expertise." In light of our analysis, however, the *Abood* amount is not an issue to be decided in the pending court proceeding. Litigation of the *Abood* issues is a complex, time-consuming and heavily fact-oriented process. Having PERB decide the issues initially, rather than causing them to be litigated in a separate court proceeding, will undoubtedly save judicial time. And, for reasons we have discussed, PERB's expertise is highly relevant to evaluation of the competing claims likely to be advanced. We conclude that when a union sues to collect agency fees due, and is entitled to judgment for such fees according to the principles stated in this opinion, a claim by employees that the amounts retained by the union exceed the amounts permitted by the federal Constitution or by the EERA must be presented to PERB, as the agency with exclusive jurisdiction to determine the issue in the first instance.[16]

---

[16]We need not, and do not, decide whether similar preemption principles should apply when, in an action brought by the union for collection of agency fees, the dissenting employees advance a colorable claim that the union's escrow and rebate procedures do not comply with federal constitutional requirements.

Let a peremptory writ of mandate issue directing the Superior Court for the County of Santa Clara to vacate its order of August 23, 1983, entered in San Jose Teachers Association v. Sandra Abernathy, etc., No. 508996, denying plaintiff's motion for summary judgment, and to enter a new and different order granting said motion.

The parties shall bear their own costs.

Bird, C. J., Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.