[No. H001548. Sixth Dist. Jan. 29, 1990.]

GILES BREAUX et al., Petitioners, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

734

736

**Counsel**

Scott A. Wilson, Jordan L. Bloom, Scott A. Johnson and Littler, Mendelson, Fastiff & Tichy, Robert F. Gore and Rex H. Reed for Petitioners.

Michael D. Stump, Daniel G. Stone, Nancy C. Smith and Cathy Christian for Respondent.

Dianna Lyons, Daniel A. Garcia and Lyons, Macri-Ortiz, Schneider, Dunphy & Camacho for Real Party in Interest.

OPINION

BAMATTRE-MANOUKIAN, J.—Giles Breaux and several other individuals, agricultural employees within the meaning of California's Agricultural Labor Relations Act (the Act) (Lab. Code, § 1140 et seq.), were required as a condition of their employment to be members of the United Farm Workers of America, AFL-CIO (the UFW). They filed unfair labor practice charges (Cal. Code Regs., tit. 8, §§ 20201-20208; cf. Lab. Code, § 1160.2) against the UFW, alleging among other things that certain moneys they were required to pay to the UFW were being used, over their objections, for political activities and "other noncollective bargaining purposes." Over their objections, the UFW and the general counsel of the Agricultural Labor Relations Board (the Board) entered into a written settlement of the charges and the Board, by its decision and order in *United Farm Workers of America, AFL-CIO (Giles Breaux, et al.)* (Dec. 19, 1985) 11 ALRB No. 32, approved the settlement with modifications. Breaux and other charging parties petitioned this court for review of the Board's decision and order.

The "union shop" agreement by which petitioners were required to be members of the UFW is authorized by the union security proviso of Labor Code section 1153, subdivision (c). In a number of cases, including a series of U.S. Supreme Court decisions and a recent decision of our own Supreme Court,[1] courts have considered whether and under what procedural safeguards an employee subject to a union shop agreement (or to a broadly similar "agency shop" agreement) under other federal and state labor

---

[1] *Railway Employees' Dept.* v. *Hanson* (1956) 351 U.S. 225 [100 L.Ed. 1112, 76 S.Ct. 714]; *Machinists* v. *Street* (1961) 367 U.S. 740 [6 L.Ed.2d 1141, 81 S.Ct. 1784]; *Railway Clerks* v. *Allen* (1963) 373 U.S. 113 [10 L.Ed.2d 235, 83 S.Ct. 1158]; *Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209 [52 L.Ed.2d 261, 97 S.Ct. 1782]; *Ellis* v. *Railway Clerks* (1984) 466 U.S. 435 [80 L.Ed.2d 428, 104 S.Ct. 1883]; *Teachers* v. *Hudson* (1986) 475 U.S. 292 [89 L.Ed.2d 232, 106 S.Ct. 1066]; *Communications Workers* v. *Beck* (1988) 487 U.S. 735 [101 L.Ed.2d 634, 108 S.Ct. 2641]; *Cumero* v. *Public Employment Relations Bd.* (1989) 49 Cal.3d 575 [262 Cal.Rptr. 46, 778 P.2d 174]. An earlier California Supreme Court judgment, in *San Jose Teachers Assn.* v. *Superior Court* (1985) 38 Cal.3d 839 [215 Cal.Rptr. 250, 700 P.2d 1252], was vacated in light of *Teachers* v. *Hudson, supra.* (*Abernathy et al.* v. *San Jose Teachers Assn.* (1986) 475 U.S. 1063 [89 L.Ed.2d 599, 106 S.Ct. 1372]; *San Jose Teachers Assn.* v. *Superior Court* (1986) 42 Cal.3d 130 [227 Cal.Rptr. 112, 719 P.2d 682].)

statutes may be compelled, over his or her objection, to provide financial support to union activities with which he or she disagrees. This proceeding raises these questions in the context of the Act.

We conclude that several terms and conditions of union membership specified in the approved settlement agreement are not "reasonable" within the meaning of the union security proviso of subdivision (c) of section 1153 of the Labor Code. Accordingly we shall annul the Board's decision and order and remand the matter to the Board for further proceedings consistent with views we shall express in this opinion.

*The Administrative Proceedings*

The collective bargaining agreements between the UFW and petitioners' employers provided for an annual "Citizenship Participation Day" (CPD), on which workers would receive a paid holiday. The UFW had voted to require its members, as a condition of good standing in the union, to authorize their employers to remit their CPD pay directly to the UFW. (Cf. *United Farm Workers of America, AFL-CIO (J. Jesus R. Conchola)* (Mar. 19, 1980) 6 ALRB No. 16, p. 3.) In short, workers were required (in petitioners' words) "to give their CPD pay to the UFW in order to keep their jobs." Petitioners' unfair labor practice charges alleged unauthorized use of their CPD pay and a portion of their union dues.

On the basis of these charges a regional director of the Board filed a complaint (Lab. Code, § 1160.2) against the UFW. As subsequently amended, the complaint alleged union unfair labor practices (Lab. Code, § 1154) with respect to the mandatory CPD contributions (count I) and the dues (count II), and further alleged that the union had requested or accepted bribes (Lab. Code, § 1155.5) with respect to the CPD contributions (count III). Counts II and III were subsequently dismissed, over petitioners' objections, by the administrative law officer.

Before count I went to evidentiary hearing the UFW and the Board's general counsel entered into a written agreement to settle all issues. In its final form the settlement agreement was made subject to the approval of the Board and was to be of no force or effect until so approved. (Cf. Cal. Code Regs., tit. 8, § 20298, subd. (a).) Petitioners were not parties to the settlement agreement; it was entered into, and ultimately approved, over their objections. Such a "unilateral" settlement is an accepted practice in labor law and is alluded to in the Board's regulations. (Cal. Code Regs., tit. 8, § 20298; cf. 2 Morris, The Developing Labor Law (2d ed. 1983) 1620.)

The process of Board approval of the settlement was protracted. The matter was twice taken to another Court of Appeal which once dismissed it

when the Board set aside the order then under review and once remanded it for further Board consideration in light of a new United States Supreme Court decision, but never reached the merits. The Board's final approval of the settlement, with Board-ordered modifications, is embodied in the decision and order now before us for review.

*The Approved Settlement Agreement*

Petitioners have acknowledged they could have been required, even over their objections, to contribute financial support to the UFW's "collective bargaining activities." On the other hand, neither the Board nor the UFW has asserted that an employee who objected could be compelled to support a union's "political activities," and both have acknowledged that an objecting employee would be entitled to a rebate of such portion of his or her union dues and assessments as would otherwise be applied to political activities. Dispute has centered on the propriety of union expenditures, over a member's objections, for activities which are neither clearly political nor clearly for collective bargaining, and on procedures by which objections may be made, disputes resolved, and appropriate rebates paid in particular cases.

The settlement agreement addressed these issues. Here is the text of the pertinent part of the settlement agreement as modified by the Board. Text stricken through (///) was deleted from the settlement agreement, and bracketed and underlined text was added, by Board order:

"(1) Respondent will institute the procedure described in this paragraph and in the attached Notice to Employees by which a union member may object to the use of any dues for activities or causes primarily political in nature. The member may perfect his objection by individually notifying the National Secretary-Treasurer of his objection by registered or certified mail; provided, however, that such objection shall be timely only during the first fourteen (14) days of union membership and during the fourteen (14) days following each anniversary of union membership. An objection may be continued from year to year by individual notification given during each annual fourteen (14) day period. The approximate proportion of the member's dues spent for such activities or causes primarily political in nature to which the member objects shall be determined by a committee of the National Executive Board, which shall be appointed by the President, subject to the approval of the National Executive Board. The member will be refunded this proportion of his/her dues. [The noncompellable portion of objecting members' Citizens Participation Day (CPD) dues shall be rebated, with interest, within one year of payment with an accounting of all expenditures deemed compellable for which any CPD dues were retained.] If an objecting member is dissatisfied with the approximate proportional allocation made by the committee of the Board or the disposition of his

objection by the National Secretary-Treasurer, the member may appeal directly to the full National Executive Board and the decision of the Board shall be appealable to the Public Review Board or the United Farm Workers constitutional convention at the option of the member. The determination made by the committee of the Board shall be sufficiently detailed and substantiated by documentation so as to allow a member to process a meaningful appeal, should he desire.

"(2) CPD funds collected subsequent to the date of this agreement from objecting members will be placed in an escrow account pending determination of the proportionate refund by the Committee of the National Executive Board.

"(3) . . . . . . . . . . . . . . . . . . . . . . . .

"(4) . . . the parties agree the CPD constitutes dues which may be collected in full, subject to a proportional rebate as outlined in this paragraph."

The UFW represents it has modified its procedure "so that objections may be lodged *at any time,* and continue from year to year without renewal, until the member withdraws the objection." The UFW's modification is constructive and should be incorporated into the Board's decision and order on remand.

Counsel for petitioners argue primarily that the Board's decision and order does not sufficiently limit union use of objecting members' dues and CPD pay, and does not provide adequate procedural safeguards for members who object to union expenditures. They rely on United States Supreme Court decisions culminating in *Teachers* v. *Hudson, supra*, 475 U.S. 292 (*Chicago Teachers*). They ask that this court remand the matter to the Board, under clear guidelines, for a more satisfactory order.

*Justiciability*

No party questions the general rule that the Board's decision and order approving a unilateral settlement agreement made subject to its approval is reviewable in this court. (Lab. Code, § 1160.8; cf. Cal. Code Regs., tit. 8, § 20298; *NLRB* v. *Food & Commercial Workers* (1987) 484 U.S. 112, 121 [98 L.Ed.2d 429, 440, 108 S.Ct. 413] (dictum); cf. also *Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 556-557 [147 Cal.Rptr. 165, 580 P.2d 665].)

But to reach the merits of the Board's decision and order we must first deal with contentions, advanced by the UFW and the Board, (1) that peti-

tioners were not *"aggrieved"* (and thus lacked standing to proceed in this court), (2) that the questions petitioners posed are not *ripe* for adjudication, and (3) that in any event this case is now *moot.*

The Act requires that a petitioner for judicial review be a person "aggrieved" by an order of the Board. (Lab. Code, § 1160.8; cf. *Municipal Court* v. *Superior Court* (1988) 202 Cal.App.3d 957, 962 [249 Cal.Rptr. 182] (standing generally).) ▆▆▆ The UFW asserts that petitioners are not aggrieved by the Board's decision and order, arguing (1) that petitioners have not sought relief through the UFW, by means of the procedures approved by the Board, and that until they have unsuccessfully attempted to do so they cannot be said to be aggrieved, and (2) that during the pendency of these proceedings petitioners have "already obtained all the relief they sought, and certainly all they may have been entitled to," and therefore are no longer aggrieved if they ever were. These theories are essentially variants of *ripeness* and *mootness,* respectively.

▆▆ "[R]ipeness . . . means that a controversy 'has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made. . . .' [Citation.] Its purpose is to prevent courts from issuing purely advisory opinions. [Citation.] In this regard, 'the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy. On the other hand, the requirement should not prevent courts from resolving concrete disputes if the consequences of a deferred decision will be lingering uncertainty in the law, especially when there is widespread public interest in the answer to a particular legal question.' [Citation.]" (*Sherwyn* v. *Department of Social Services* (1985) 173 Cal.App.3d 52, 57-58 [218 Cal.Rptr. 778]; cf. *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 169-174 [188 Cal.Rptr. 104, 655 P.2d 306].)

The UFW uses the "ripeness" label but evokes the distinguishable doctrine of *exhaustion of remedies*: "[N]one of these petitioners have elected to lodge an objection or attempted to utilize the [UFW's rebate] procedure. Their contentions that either *Ellis* [v. *Railway Clerks, supra,* 466 U.S. 435] or . . . [*Chicago Teachers, supra,* 475 U.S. 292] would compel a certain result *in the event that an employee made such a challenge to the UFW's rebate procedure,* asks this Court for an advisory opinion." Further, "[n]o employee objection to UFW expenditures has yet been pursued through the proper channels to produce a ripe controversy over what expenditures the [Act] permits the Union to make with compelled dues. Exclusive primary jurisdiction to make such an initial determination rests with Respondent

Board." The Board agrees: "[U]ntil petitioners have made specific objection to the UFW, and thereafter have specific complaints about the manner of the rebate or the amounts thereof, the arguments posed in this case are not ripe for adjudication."

■ The doctrine of exhaustion of remedies is based in policy notions of orderly and efficient dispute resolution and conservation of judicial resources. If a remedy is arguably available in some other forum then, in general, "although a cause of action has arisen which is properly triable in the courts, exhaustion of [the alternative] remedy is a procedural condition precedent to the suit." (3 Witkin, Cal. Procedure (3d ed. 1985) Actions, § 222, p. 253.) In the abstract petitioners would be required, before they came to court, to have exhausted both "internal" and "administrative" remedies. ■ "It is the general and well established jurisdictional rule that a plaintiff who seeks judicial relief against an organization of which he is a member must first invoke and exhaust the remedies provided by that organization applicable to his grievance. [Citations.]" (*Holderby* v. *Internat. Union etc. Engrs.* (1955) 45 Cal.2d 843, 846 [291 P.2d 463]; cf. *Pasillas* v. *Agricultural Labor Relations Bd.* (1984) 156 Cal.App.3d 312, 356-357 [202 Cal.Rptr. 739].) ■ And so far as potentially relevant to a dispute under the Act, it is the similarly "jurisdictional" rule that "where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." (*Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942, 132 A.L.R. 715]; cf. *George Arakelian Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1985) 40 Cal.3d 654, 661-662 [221 Cal.Rptr. 488, 710 P.2d 288]; *United Farm Workers* v. *Superior Court* (1977) 72 Cal.App.3d 268, 276-277 [140 Cal.Rptr. 87].)

■ Had the UFW and the general counsel elected to proceed to hearing on the complaint, rather than to conclude a unilateral settlement, their ripeness arguments might have been relevant to the contested proceedings, both before the Board and in this court.

But when they chose to settle as between themselves, and obtained Board approval of their settlement as modified by the Board, the UFW and the general counsel consciously foreclosed adjudication of the original dispute, and thus rendered irrelevant defenses that might have been asserted in proceedings on that dispute. Among other considerations, the unilateral settlement agreement effectively denied petitioners the opportunity to meet, or to avoid, the assertion that the original dispute was not ripe for adjudication. The approved settlement agreement has superseded the contested proceedings, and petitioners' challenge to the approved settlement agreement creates a wholly new dispute.

The new dispute is unquestionably ripe for adjudication. The approved settlement agreement is properly before us upon the petition of individuals manifestly aggrieved by the immediate prospect of being required to abide by an illegal procedure. And it would have been futile and a waste of time— "needless litigation," in the Board's own phrase—to ask petitioners to wait for specific facts upon which to challenge the settlement before the very entities (the UFW and the Board) which negotiated and approved it. (*Haller* v. *Burbank Community Hospital Foundation* (1983) 149 Cal.App.3d 650, 658 [197 Cal.Rptr. 45] (futility of internal remedy); *Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830, 834 [112 Cal.Rptr. 761] (futility of administrative remedy).) Beyond the Board, petitioners' only legitimate recourse was to the courts.

■ While issues which may someday be, but are not yet, justiciable are sometimes said not to be "ripe," issues which have been, but (by virtue of intervening acts or events) are no longer, justiciable may be said to be "moot." Mootness is sometimes defined in terms of the court's loss of ability to grant effective relief. (See, e.g., *Consol. etc. Corp.* v. *United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725]; cf. generally 3 Witkin, Cal. Procedure, *supra*, Actions, §§ 50-54, pp. 80-85.)

■ The UFW argues that petitioners "have not only obtained all that the general counsel's complaint requested, but also, all that they requested," and, "[a]ccordingly, the instant litigation is merely academic."

Again the UFW appears to confuse the original dispute, on which the regional director's complaint was based, with petitioners' challenge to the approved settlement agreement which has superseded the original dispute. Had the complaint been fully litigated it may ultimately have been shown that petitioners had received all the relief they then sought. But litigation of the original dispute was abrogated by the unilateral settlement. In this proceeding petitioners have sought relief from the operation of the settlement agreement itself. In essence petitioners have asked this court to declare, as a matter of law, the validity or invalidity of the approved settlement agreement. Only the courts can grant the requested relief.

We do not question the UFW's representations that it has acquiesced in good faith to every procedural demand made by agricultural employees with respect to its dues and assessments. Indeed, we acknowledge and commend the UFW's willingness to consider every member's concerns and objections and to seek to comply, without judicial compulsion, with procedures designed to assure fairness to objecting members. But so long as the approved settlement agreement remains, unqualified, on the public record the UFW's voluntary actions will not suffice to moot this matter.

A more troubling question of mootness is raised by the revelation, at oral argument, that none of the petitioners remains a member of either of the two bargaining units in which the original dispute arose. It appears, indeed, that the employers with whom the original collective bargaining agreements were negotiated may have gone out of business. There is no showing petitioners are now members of any bargaining unit subject to the Act. Thus, in a narrow sense, we can no longer grant effective relief to these petitioners in the context of an existing labor-management relationship.

It is nevertheless apparent that this matter presents questions of continuing public interest that are likely to recur. The matter has been vigorously briefed and argued by able counsel. In these circumstances we can, and shall, reach the merits. (Cf. *John A.* v. *San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301, 307 [187 Cal.Rptr. 472, 654 P.2d 242]; *Fields* v. *Eu* (1976) 18 Cal.3d 322, 325 [134 Cal.Rptr. 367, 556 P.2d 729].)

*Scope and Standards of Review*

Our review extends only to the Board's decision and order and the approved settlement agreement it incorporates, and to those elements of the record which place the decision and order in context. The underlying charges have never been adjudicated and are not before us for review.

■ We assess the Board's explicit or implicit legal conclusions and, ultimately, the propriety of the decision and order as a matter of law. (Cf. *Cumero* v. *Public Employment Relations Bd., supra,* 49 Cal.3d 575, 586-587.) In its brief the Board, and at oral argument the UFW, have argued that the decision and order in fact represents an application of the Board's broad discretionary authority over remedies under the Act (see, e.g., *Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, 673-674 [205 Cal.Rptr. 657, 685 P.2d 701]), and thus the proper standard of review is that applicable to discretionary rulings generally. The Board has further suggested that this court should defer to the strong policy preference for settlement (cf. *Local 282, International Bro. of Teamsters, etc.* v. *N.L.R.B.* (2d Cir. 1964) 339 F.2d 795, 799), which is " 'the lifeblood of the administrative process' " and to be preferred to litigation. But neither the Board's control of remedies nor the preference for negotiated settlement is strictly relevant to the situation before us. In this matter the Board was called upon not to fashion a remedy appropriate to a perceived wrong, but rather to give binding approval to a compromise procedure arrived at between the general counsel and the union, without the participation and over the objection of the assertedly aggrieved charging parties. And because the settlement was made conditional on Board approval, and the approval was made conditional upon modifications which the union accepted, the final outcome was

more strictly a Board-ordered alteration of the UFW's internal rules than a private settlement of the underlying dispute. The question is whether the approved settlement agreement is valid *as a matter of law.*

*Statutory Validity*

■ In their briefing of the merits, the parties addressed primarily constitutional issues: Whether enactment of subdivision (c) of Labor Code section 1153, and the activities of the UFW and the Board under that subdivision in this matter, constituted "state action" subject to constitutional limitation and, if so, whether any of those activities exceeded any relevant constitutional limitation. We are satisfied that enactment of subdivision (c) was not state action in and of itself. (*Pasillas* v. *Agricultural Labor Relations Bd., supra,* 156 Cal.App.3d 312, 347; cf. *Beltran* v. *State of Cal.* (9th Cir. 1988) 871 F.2d 777, 783, reversing *Beltran* v. *State of Cal.* (N.D.Cal. 1985) 617 F.Supp. 948 with instructions to dismiss.) ■ Mindful of the general rule that a court will not reach constitutional questions unless required to do so to dispose of the matter before it (*Cumero* v. *Public Employment Relations Bd., supra,* 49 Cal.3d 575, 576; *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; *People* v. *Buckley* (1986) 183 Cal.App.3d 489, 495 [228 Cal.Rptr. 128]), we shall next consider whether the approved settlement agreement would be valid, in challenged respects, under the Act itself. At our request the parties have addressed the statutory issues in additional briefing and at oral argument.

The Act's union security proviso (contained in the second paragraph of subdivision (c) of section 1153 of the Labor Code) reads in pertinent part as follows: "Nothing in this part, or in any other statute of this state, shall preclude an agricultural employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this section as an unfair labor practice) to require as a condition of employment, membership therein on or after the fifth day following the beginning of such employment, or the effective date of such agreement whichever is later, if such labor organization is the representative of the agricultural employees as provided in Section 1156 in the appropriate collective-bargaining unit covered by such agreement. . . . For purposes of this chapter, membership shall mean the satisfaction of all reasonable terms and conditions uniformly applicable to other members in good standing; provided, that such membership shall not be denied or terminated except in compliance with a constitution or bylaws which afford full and fair rights to speech, assembly, and equal voting and membership privileges for all members, and which contain adequate procedures to assure due process to members and applicants for membership."

Consistent with the union security proviso, the collective bargaining agreements relevant to this matter require as a condition of employment that each worker become and remain a union member. The proviso defines union "membership" as "the satisfaction of all reasonable terms and conditions uniformly applicable to other members in good standing . . . ." The effect of the definition is that no worker may be excluded from membership, and thus from employment in a union shop, by virtue of an applicable term or condition that is not "reasonable."

Among the terms and conditions of membership imposed by the UFW are requirements that members contribute dues and CPD pay to support the union. The approved settlement agreement altered these terms and conditions, by virtue both of the agreement between the UFW and general counsel and of the Board's modifications to the agreement. By its ultimate approval the Board implicitly concluded that the alterations themselves, and the terms and conditions of membership as thus altered, are enforceable and thus, necessarily, are "reasonable."

Our review focuses on the Board's implicit conclusion. If the terms and conditions of membership, as altered, are not "reasonable" they may not be enforced, and in this sense are not valid, under the union security proviso, and the Board's decision and order must be annulled.

Petitioners assert that the terms and conditions are unreasonable. The UFW disagrees. The Board is now prepared to acknowledge that, in light of recent legal developments, the terms and conditions may no longer be reasonable.

Preliminarily we reject petitioners' assertion that use of registered or certified mail "is ill-suited to agricultural employment, and it is unreasonable to require agricultural workers to follow it." A dissenting member must make his or her dissent known to the union. The requirement that notice be by registered or certified mail is so well suited to the need to document the giving of notice as to survive the colorable objection that the procedure will be inconvenient for "the often migratory, often illiterate, farmworker . . . ."[2]

In *Pasillas* v. *Agricultural Labor Relations Bd., supra,* 156 Cal.App.3d 312, 349-356, a Court of Appeal discussed the reasonableness requirement extensively in the context of Board review of actual terminations of union membership (on grounds other than nonpayment of dues or assessments),

---

[2] The UFW represents that it has modified the notice procedure "to permit regular, first class mail, or personal service upon the local Union Crop Manager."

concluding that "an internal rule forming the basis for the underlying charge shall be deemed a 'reasonable' term or condition of membership only if the Board determines (1) that the rule is reasonable in its relation to legitimate union goals and functions, and (2) that, after balancing union interests and the interests of the worker, application of the rule is reasonable in the particular case at hand." (156 Cal.App.3d at pp. 355-356.)

Review of the approved settlement agreement in this case is necessarily more abstract, involving not actual or threatened but only potential termination of membership. ▪ We conclude, however, that similar standards apply: We must take into account not only "legitimate union goals and functions" but also the legitimate interests of the worker who is asked to contribute money to the union and whose livelihood may depend on his or her ability to retain union membership.

We are greatly aided, in our assessment of the legitimate interests of both unions and workers, by the fact that the United States Supreme Court has painstakingly covered much of the same ground in a series of six opinions. All deal with union security provisions in collective bargaining agreements: Four under the union shop authorization of the federal Railway Labor Act (RLA) (45 U.S.C. § 151 et seq.) and two under state statutes which authorized "agency shop" agreements for local government employees. Three of the decisions turn on federal constitutional grounds, two on construction of the RLA, and one on both statutory and constitutional grounds. A more recent seventh opinion applies the United States Supreme Court's construction of the union security provision of the RLA to the comparable provision of the National Labor Relations Act as amended (NLRA) (29 U.S.C. § 151 et seq.).

*Railway Employees' Dept.* v. *Hanson, supra,* 351 U.S. 225, upheld the facial constitutionality of the union shop provision of the RLA. The United States Supreme Court held that the statutory provision, although permissive, amounted to governmental action subject to constitutional scrutiny because (by virtue of its express preemption of state law) it "sought to strike down inconsistent [right to work] laws in 17 States." (351 U.S. at pp. 231-232 [100 L.Ed. at p. 1130]; cf. *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, 218, fn. 12 [52 L.Ed.2d 261, 273-274]; *Pasillas* v. *Agricultural Labor Relations Bd., supra,* 156 Cal.App.3d 312, 344.) The United States Supreme Court concluded that "the requirement for financial support of the collective-bargaining agency by all who receive the benefits of its work is within the power of Congress under the Commerce Clause and does not violate either the First or the Fifth Amendments." (351 U.S. at p. 238 [100 L.Ed.2d at p. 1134].)

*Machinists* v. *Street, supra,* 367 U.S. 740, construed the RLA; it did not reach constitutional issues. The United States Supreme Court concluded that the RLA union shop provision "contemplated compulsory unionism" only "to force employees to share the costs of negotiating and administering collective agreements, and the costs of the adjustment and settlement of disputes," and cannot be read "to provide the unions with a means for forcing employees, over their objection, to support political causes which they oppose." (367 U.S. at p. 764 [6 L.Ed.2d at p. 1159], fn. omitted.) Nevertheless, an employee would remain obliged to make the payments called for by the union shop agreement, and could have remedies against improper union expenditure of that money only if he or she made his or her objections known to the union. (*Id.* at pp. 771, 774 [6 L.Ed.2d at pp. 1162, 1164].) One such remedy "would be restitution to each individual employee of that portion of his money which the union expended, despite his notification, for the political causes to which he had advised the union he was opposed." (*Id.* at p. 775 [6 L.Ed.2d at p. 1164].)

*Railway Clerks* v. *Allen, supra,* 373 U.S. 113, also construed the RLA. The decision elaborated upon the *Street* analysis, and suggested the efficacy of a voluntary union plan "by which dissenters would be afforded an internal union remedy." (*Id.* at p. 122 [10 L.Ed.2d at p. 242].) *Allen* added the perception that "[s]ince the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of proving such proportion." (*Id.* at pp. 121-122 [10 L.Ed.2d at p. 241].)

*Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, involved a state statute which authorized agency shop agreements for local government employees. Acknowledging that "the actions of public employers surely constitute 'state action'" (*id.* at p. 226 [52 L.Ed.2d at p. 278]), the United States Supreme Court concluded that First Amendment principles (applicable to the state by way of the Fourteenth Amendment) "prohibit the [union] from requiring any of the [teachers] to contribute to the support of an ideological cause he may oppose as a condition of holding a job as a public school teacher." (*Id.* at p. 235 [52 L.Ed.2d at p. 284].) As to appropriate remedies, the United States Supreme Court borrowed freely from the reasoning and broad rhetoric of its RLA decisions in *Street* and *Allen.* (*Id.* at pp. 237-242 [52 L.Ed.2d at pp. 285-289].)

*Ellis* v. *Railway Clerks, supra,* 466 U.S. 435, dealt more specifically with remedies. Its analysis of a union's "rebate scheme," for making restitution to objecting employees under the RLA, appears to have been purely statutory; it concluded that by means of the rebate scheme the union improperly

"obtains an involuntary loan for purposes to which the employee objects. [¶] . . . [T]here are readily available alternatives, such as advance reduction of dues and/or interest-bearing escrow accounts, that place only the slightest additional burden, if any, on the union. Given the existence of acceptable alternatives, the union cannot be allowed to commit dissenters' funds to improper uses even temporarily." (466 U.S. at p. 444 [80 L.Ed.2d at p. 439].) Turning to a list of six specified union expenditures, the United States Supreme Court generalized that, as a matter of statutory construction of the RLA (cf. 466 U.S. at pp. 444-445 [80 L.Ed.2d at pp. 439-440]), an objecting employee may be required to support only expenditures "necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues." (466 U.S. at p. 448 [80 L.Ed.2d at p. 442].) The United States Supreme Court applied this general rule to the six specified union expenditures before it, and then considered whether the compelled financial support violated the First Amendment, noting that "[w]e need only address this contention with regard to the three activities for which, we have held, the RLA allows the union to use their contributions. We perceive no constitutional barrier." (466 U.S. at p. 455 [80 L.Ed.2d at p. 446].)

*Chicago Teachers, supra*, 475 U.S. 292, like *Abood*, was an agency shop case under a state statute. The decision appears to be based solely on the federal Constitution. The United States Supreme Court reaffirmed an objective it had stated in *Abood*: " '[T]o devise a way of preventing compulsory subsidization of ideological activity by employees who object thereto without restricting the Union's ability to require every employee to contribute to the cost of collective-bargaining activities.' " (475 U.S. at p. 302 [89 L.Ed.2d at p. 244].) "Procedural safeguards are necessary to achieve this objective for two reasons. First, although the government interest in labor peace is strong enough to support an 'agency shop' notwithstanding its limited infringement on nonunion employees' constitutional rights, the fact that those rights are protected by the First Amendment requires that the procedure be carefully tailored to minimize the infringement. Second, the nonunion employee—the individual whose First Amendment rights are being affected—must have a fair opportunity to identify the impact of the governmental action on his interests and to assert a meritorious First Amendment claim." (475 U.S. at pp. 302-303 [89 L.Ed.2d at pp. 244-245] (fns. 10-12 omitted).) The United States Supreme Court set down three requirements which it perceived to be constitutionally mandated for nonmember employees in an agency shop; we have added underlining for emphasis:

(1) "[A]n adequate explanation of the basis for the fee. . . ." (475 U.S. at p. 310 [89 L.Ed.2d at p. 249].) Any calculation by which the union seeks, in advance, to fix the amount of a nonmember's contribution must be accompanied by "sufficient information [to enable potential objectors] to gauge the

propriety of the union's fee. Leaving the nonunion employees in the dark about the source of the figure for the agency fee—and requiring them to object in order to receive information—does not adequately protect the careful distinctions drawn in *Abood*." (*Id*. at p. 306 [89 L.Ed.2d at p. 247], fn. omitted.)·

(2) "[A] reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker. . . ." (475 U.S. at p. 310 [89 L.Ed.2d at p. 249].) "The nonunion employee, whose First Amendment rights are affected by the agency shop itself and who bears the burden of objecting, is entitled to have his objections addressed in an expeditious, fair, and objective manner." (*Id*. at p. 307 [89 L.Ed.2d at p. 247], fn. omitted.)

(3) "[A]n escrow for the amounts reasonably in dispute while such challenges are pending." (475 U.S. at p. 310 [89 L.Ed.2d at p. 249]), to avoid or minimize "the risk that dissenters' funds may be used temporarily for an improper purpose." (475 U.S. at pp. 305, 309 [89 L.Ed.2d at pp. 246, 248].) The escrow must be accompanied by sufficient provision for requirements (1) and (2)), but given such provision an "escrow of 100% of the contributions" is not constitutionally required: "Such a remedy has the serious defect of depriving the Union of access to some escrowed funds that it is unquestionably entitled to retain. If, for example, the original disclosure by the Union had included a certified public accountant's verified breakdown of expenditures, including some categories that no dissenter could reasonably challenge, there would be no reason to escrow the portion of the nonmember's fees that would be represented by those categories." (*Id*. at pp. 309-310 [89 L.Ed.2d at p. 249], fn. omitted.)

In a recent decision in this area, *Communications Workers* v. *Beck, supra,* 487 U.S. 735 [101 L.Ed.2d 634], the United States Supreme Court applied its construction of the union security provision of the RLA, as most recently elaborated in *Ellis*, to the comparable provision of the NLRA, reasoning that the two provisions "are in all material respects identical" (*id*. at p. 745 [101 L.Ed.2d at p. 646], fn. omitted) and that "[g]iven the parallel purpose, structure, and language of [the NLRA provision], we must interpret that provision in the same manner [as the RLA provision]." (*Id*. at p. 752 [101 L.Ed.2d at p. 650], fn. omitted; cf. Hartley, *Constitutional Values and the Adjudication of Taft-Hartley Act Dues Objector Cases* (1989) 41 Hastings L.J. 1.)

In its constitutional decisions—*Hanson, Abood, Chicago Teachers,* and, to a limited degree, *Ellis*—the United States Supreme Court undertook to balance the rights of individual workers under the First (and, in *Hanson,* the Fifth) Amendments against the interests of the state in effective collective bargaining. In its RLA decisions—*Street, Allen,* and *Ellis*—it

sought a basis for its construction of the federal statute (and in *Beck* it found the same basis and applied the same construction to the NLRA). In each instance the United States Supreme Court had recourse to broad precepts of labor relations policy. The universality of this inquiry was reflected in the United States Supreme Court's willingness to transport analysis from one class of case to another. Thus in *Abood*, for example, for purposes of constitutional analysis the United States Supreme Court discussed "familiar doctrines in the federal labor laws" at some length, relying substantially on the analysis it had made, for purposes of statutory construction of the RLA, in *Street.* (*Abood* v. *Detroit Board of Education, supra*, 431 U.S. 209, 217-232 [52 L.Ed.2d at pp. 272-283].) This universality encompasses the issues before us. For example, where—as in *Chicago Teachers, supra,* 475 U.S. 292, 303 [89 L.Ed.2d 232, 244-245]—the United States Supreme Court attributed the need for "carefully tailored" procedures to the fact workers' First Amendment interests were in the balance, we find a comparable need, in the name of reasonableness, to protect the right of a worker to refuse to pay more of his or her money to a union than the purposes of the Act's union security proviso plainly require. We conclude the United States Supreme Court's generalizations are valid abstract statements of reasonable standards for union security provisions and, as such, are directly relevant to our analysis under the Act.

Our conclusion draws support from *Cumero* v. *Public Employment Relations Bd., supra*, 49 Cal.3d 575, in which the California Supreme Court relied on the United States Supreme Court decisions, and especially on *Ellis* and *Chicago Teachers,* in construing broadly comparable (albeit in several respects distinguishable) provisions of California's Educational Employment Relations Act (Gov. Code, § 3540 et seq.).

In varying degrees the parties agree with our conclusion. The Board now directly acknowledges the need to construe the Act's union security proviso in light of the United States Supreme Court decisions. Counsel for petitioners consider *Ellis* and *Chicago Teachers* "very relevant" while doubting the relevance of the earlier decisions. The UFW deems the decisions "relevant for their persuasive value" but "not controlling" in view of the several distinctions between those decisions and this matter.

 We hold, consistent with the United States Supreme Court decisions, that reasonable terms and conditions of membership *with respect to dues and other assessments* are those that provide a definition and procedural rules sufficient to prevent compulsory subsidization of union activity to which a worker objects and which does not directly benefit him or her, without restricting the union's ability to require every member to contribute to the cost of activities which do directly benefit members generally. (Cf.

*Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, 237 [52 L.Ed.2d at p. 285].) Implementation of this generalization should, we believe, proceed along the lines suggested in the United States Supreme Court decisions.

Tested by the standards set in those decisions the approved settlement agreement fails to provide either a sufficient definition or adequate procedural rules. As to definition, the agreement does not sufficiently limit the UFW's use of an objecting member's dues and CPD pay. *Ellis* suggests a general definition which, we conclude, is applicable and appropriate. As to procedures, the agreement fails to provide unequivocally for an escrow of *all* disputed contributions (whether characterized as CPD pay or as dues), or for timely dissemination of "sufficient information [to enable potential objectors] to gauge the propriety of the union's fee," or for a clearly "impartial decisionmaker" to whom the objecting worker may appeal. (*Chicago Teachers, supra,* 475 U.S. at pp. 306, 310 [89 L.Ed.2d at pp. 246-247, 249].) Each of these procedural rules was spelled out, as a constitutional requirement, in *Chicago Teachers,* but in our view each should also be regarded as an element of reasonableness under the Act's union security proviso. (Cf. also *Cumero* v. *Public Employment Relations Bd., supra,* 49 Cal.3d 575, 590.)

(1) *Definition.*

The approved settlement agreement forbids union expenditure of a member's contribution, over his or her objection, for "activities or causes primarily political in nature"; implicitly it permits expenditures for any other purpose.[3]

 Petitioners argue that the approved settlement agreement "does not limit the UFW's use of an objecting employee[']s dues or CPD pay to collective bargaining activities" as required (in petitioners' view) by *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, and *Ellis* v. *Railway*

---

[3] In an "Administrative Letter" dated December 3, 1981, the UFW defined expenditures for "activities or causes primarily political in nature" and "political purposes" as "those which are partisan political in nature. We have included contributions to political candidates, to partisan political organizations and to social, economic and ideological groups, unrelated to trade union activities to which reasonable objection might be made. . . . [¶] Excluded from consideration as political expenditures, of course, are expenditures for such activities as collective bargaining, strike activity, organizing, housekeeping and administration, minimizing or eliminating competition to members from foreign unions by helping to improve such workers' pay and conditions, inter-union support and relationships, education and training, general community relations, support for programs of social and economic importance to the membership and the community and the nation at large, recreation and conservation, charity, workers' and unemployment compensation and safety work, public relations and information and all membership services."

*Clerks, supra,* 466 U.S. 435. The Board asserts that the settlement agreement's language "is broad enough to encompass any expenditures deemed non-compellable using either the *Ellis* [v. *Railway Clerks, supra,* 466 U.S. 435] or *Pasillas* [v. *Agricultural Labor Relations Bd., supra,* 156 Cal.App.3d 312] tests for compellability." The UFW does not directly address the issue.

Petitioners have the better of this argument. The principles stated in *Ellis* are relevant and valid under the Act and warrant adoption as more specific standards of reasonableness under the Act's union security proviso. According to *Ellis,* "the test must be whether the challenged expenditures are necessarily or reasonably incurred for the purpose of performing the duties of an exclusive representative of the employees in dealing with the employer on labor-management issues. Under this standard, objecting employees may be compelled to pay their fair share of not only the direct costs of negotiating and administering a collective-bargaining contract and of settling grievances and disputes, but also the expenses of activities or undertakings normally or reasonably employed to implement or effectuate the duties of the union as exclusive representative of the employees in the bargaining unit." (466 U.S. at p. 448 [80 L.Ed.2d at p. 442].)

In *Ellis* the United States Supreme Court concluded that (among others) organizing expenses, designed to bring the perceived benefits of labor organization to previously unrepresented workers, would not meet its test. A lower court had held that such expenses "could be charged to objecting employees because organizing efforts are aimed toward a stronger union, which in turn would be more successful at the bargaining table." (466 U.S. at p. 451 [80 L.Ed.2d at p. 444].) The United States Supreme Court disagreed for three reasons. First, "the notion that [the RLA union security provision] would be a tool for the expansion of overall union power appears nowhere in the legislative history." Second, recruitment outside the bargaining unit "can afford only the most attenuated benefits to collective bargaining on behalf of the dues payer." Third, "the free rider Congress had in mind was the employee the union was required to represent and from whom it could not withhold benefits obtained for its members. Nonbargaining unit organizing is not directed at that employee." (*Id.* at pp. 451-452 [80 L.Ed.2d at pp. 444-445].)

In its brief the Board submitted that the history and underlying policy of the Act support broader union activity than that contemplated by the RLA, extending in particular to organizational activities. We do not question the validity of the Board's perception. Nor would we suggest that union organizational activities, or union expenditures for such activities, are not proper and legitimate in general.

But we are not required to address so broad an issue. In *Ellis* the United States Supreme Court did not question the significance of workers' self-organization rights (RLA § 2(3), 45 U.S.C. § 151a(3); cf. *Labor Bd.* v. *Greyhound Lines* (1938) 303 U.S. 261, 266-267 [82 L.Ed. 831, 834-835, 58 S.Ct. 571, 115 A.L.R. 307]), or the importance of union organizational activities to these rights (cf. *Labor Board* v. *Babcock & Wilcox Co.* (1956) 351 U.S. 105, 113 [100 L.Ed. 975, 76 S.Ct. 679]). Both are similarly well established under the Act. (Lab. Code, §§ 1140.2, 1152, 1153, subd. (a); *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 403-410 [128 Cal.Rptr. 183, 546 P.2d 687].) The only issue before the United States Supreme Court was whether, under the RLA, an objecting member could be compelled to provide *financial support* for organizational activities. Addressing a similarly narrow issue in this case, we reach a similar conclusion: Contrary to the Board's contention, an objecting member may not be compelled, under the union security proviso of the Act, to help defray the union's organizing expenses. It may be true, as the Board suggests, that the Act, unlike the RLA, *was* intended as in a sense "a tool for the expansion of overall union power." But in our view the controlling consideration is that here (as in *Ellis*) the union's organizational activity is not of sufficiently direct benefit to the worker who is already a member of a represented bargaining unit. (Cf. also *Cumero* v. *Public Employment Relations Bd., supra*, 49 Cal.3d 575, 600-603.)

(2) *Procedures.*

(a) *Escrow.*

■ Petitioners assert that the *Chicago Teachers* requirement of "an escrow for the amounts reasonably in dispute while such challenges are pending" (475 U.S. at p. 310 [89 L.Ed.2d at p. 249]) is "only partially" met inasmuch as the agreement does not expressly call for an escrow of *dues* and, at the same time, requires an escrow for "the *entire* amount of CPD pay . . . , depriving the objecting employee of the use of those funds, including amounts to which the union is clearly not entitled, for up to a year."

The Board acknowledges that the escrow provision should apply to disputed dues as well as to disputed CPD pay, and states that it will modify its decision and order accordingly. The decision and order should be so modified.

Petitioners' assertion that the escrow extends to portions of CPD pay which, beyond reasonable dispute, should be refunded is supported by a literal reading of the approved settlement agreement. *Chicago Teachers*

makes clear that only "amounts reasonably in dispute" should be escrowed. (475 U.S. at p. 310 [89 L.Ed.2d at p. 249].) We assume for purposes of analysis that the full amount of dues charged by a union to its members might, in the event of a member's objection, be divided into three parts: (1) amounts (such as those clearly allocable to collective bargaining) indisputably owed to the union; (2) amounts (such as those clearly allocable to political activities) indisputably refundable to a member who objects; and (3) amounts which fall into neither of the first two categories and thus may be said to be reasonably subject to dispute. *Chicago Teachers* was treated by the United States Supreme Court as though it involved only categories (1) and (3): In the agency shop situation before the court, the union in setting the service fee for nonmembers had subtracted from its ordinary membership dues an amount which the United States Supreme Court apparently deemed equivalent to category (2). Thus the United States Supreme Court had no occasion in *Chicago Teachers* to consider whether funds in category (2) should be escrowed. But surely the rationale of the decision would not require that such funds be escrowed. Amounts which indisputably cannot be retained by the union over a member's objection should be promptly refunded with interest from the date of objection; amounts which "no dissenter could reasonably challenge" can be put to use by the union. (*Id.* at p. 310 [89 L.Ed.2d at p. 249].) The decision and order should be modified to make this clear, both as to dues and as to CPD pay.

(b) *Dissemination of Information.*

■ Petitioners assert that the approved settlement agreement does not sufficiently require timely dissemination of information.

Under the agreement, "[t]he determination made by the committee of the Board," which we understand to mean the determination of "[t]he approximate proportion of the member's dues spent for such activities or causes primarily political in nature to which the member objects," "shall be sufficiently detailed and substantiated by documentation so as to allow a member to process a meaningful appeal, should he desire." This language may be read to suggest that detailed information need not be furnished to the member until after he or she has objected and the objection has been at least in part overruled. Is this sufficient to satisfy *Chicago Teachers*?

There is room to argue that the requirement of *Chicago Teachers* that a worker have this information *before he or she can be required to decide whether or not to object* in the first place is applicable only to nonmembers under agency shop contracts, and then only in the situation (presented in *Chicago Teachers*) where the union has calculated a reduced service fee for nonmembers in advance of assessment. But in our view the rationale of the

requirement is as applicable to the union shop situation as to an agency shop: Like the nonunion employee in an agency shop (*Chicago Teachers, supra*, 475 U.S. 292, 306 [89 L.Ed.2d 232, 246-247]), the dissenting union member in a union shop (cf. *Machinists* v. *Street, supra*, 367 U.S. 740, 774 [6 L.Ed.2d at p. 1164]) must bear the initial burden of making an objection, but in either case "the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated . . . ." (*Abood* v. *Detroit Board of Education, supra*, 431 U.S. 209, 239-240 fn. 40 [52 L.Ed.2d 261, 287] (agency shop); *Railway Clerks* v. *Allen, supra*, 373 U.S. 113, 122 [10 L.Ed.2d 235, 241-242] (union shop).) In either case "[b]asic considerations of fairness" (*Chicago Teachers, supra*, 475 U.S. 292, 306 [89 L.Ed.2d 232, 246]) would require that the union give those who might object (whether nonmember employees in the agency shop situation or dissenting members in a union shop) information sufficient to permit an informed decision whether to object. (*Ibid.*)

The mechanics of such a requirement would be simpler in the agency-shop situation addressed in *Chicago Teachers* (or even for the "financial core" variant of union membership judicially countenanced under the federal union-shop statutes (cf. *Labor Board* v. *General Motors* (1963) 373 U.S. 734, 741-744 [10 L.Ed.2d 670, 675-677, 83 S.Ct. 1453]; 2 Morris, The Developing Labor Law, *supra*, pp. 1365-1367) than they are in the union-shop situation before this court. In the agency shop context, a requirement that the union furnish information as to the basis for its service fee to every nonmember to whom the service fee will be charged is supported by the perception that an objection may reasonably be anticipated from anyone who has chosen not to join the union. In a union shop under the Act's broad union security proviso (cf. *Pasillas* v. *Agricultural Labor Relations Bd., supra*, 156 Cal.App.3d 312, 353-355), every employee must be a full-fledged union member, and there is no consistent objective basis for an inference as to which of the members will object. The only workable solution, to assure that every member will have a sufficient opportunity to make an informed objection, is to require that every assessment of dues or any other form of contribution from *any* member to the union—whether by invoice, by payroll deduction memorandum, or otherwise—be accompanied by a clear statement of the allocations to be made if the member does not object. The statement should reflect both percentages and a dollars-and-cents application of the percentages to the amount of the dues or assessment withheld from or to be paid by the member, and should be accompanied by an explanation which is at once clear and sufficient to meet the *Chicago Teachers* standard.

(c) *Impartial Decision Maker.*

■■■ Petitioners assert that *Chicago Teachers*'s requirement of "a reasonably prompt opportunity to challenge the amount of the fee before an

impartial decisionmaker" is not met by the approved settlement agreement. In petitioners' view the one-year deadline for rebates does not assure a "reasonably prompt" opportunity for appeal, and the approved settlement agreement "nowhere provides for any involvement by an 'impartial decisionmaker.'"

We are disinclined to quibble with the settlement's one-year limitation, although we point out that in our view the limitation should be treated as exactly that: An ultimate deadline terminating a period within which the union will be obliged to act as promptly as it reasonably can. The union must in any event pay any amount refundable beyond reasonable dispute as soon as it receives the later of the member's objection or his or her payment.[4] Further, as soon as the review process is completed the union must pay any additional amount found to be due the objecting member. In any event, any such payment to an objecting member shall bear interest from the date of objection. With these qualifications we are satisfied the settlement meets the promptness standard of *Chicago Teachers.*

On the other hand, we are not satisfied the settlement makes adequate provision for an "impartial decisionmaker." It appears to us that, as in *Chicago Teachers,* "the 'most conspicuous feature of the procedure is that from start to finish it is entirely controlled by the union, which is an interested party . . . .'" (*Chicago Teachers, supra,* 475 U.S. at p. 308 [89 L.Ed.2d at p. 248].)

Both the UFW and the Board rely on the provision for appeal, at the worker's option, to the union's "Public Review Board." The Board asserts that the Public Review Board "is identical to that of the United Auto Workers, which has been widely approved and repeatedly acclaimed for being fair and reasonable." The UFW states that "the Public Review Board has already garnered a reputation for strict and emphatic protections of individual workers' rights when they appeal from Union determinations." The nature and composition of the Public Review Board are described as follows in the UFW Constitution in the agreed record before us: "Section 1: To further strengthen democracy and appeal procedures within the Union as they affect the vital rights and privileges of members, there shall be established a Public Review Board consisting of impartial persons, dedicated to the welfare and advancement of farm workers, and not working under the jurisdiction of the Union or full-time for the Union. [¶] Section 2: The Public Review Board shall consist of 3 members, including the Chairman. Their terms shall be for the period between regular Conventions. At the

---

[4] Commendably, the UFW has gone so far as to implement a "prospective rebate procedure" under which "[r]ebates are paid almost immediately upon receipt of an objection, even before dues warranting a full year's rebate are collected."

First Constitutional Convention, the President shall, subject to the approval of the National Executive Board, propose the names of the Chairman and other members of the Public Review Board for ratification by the Convention. Any vacancy on the Public Review Board shall be filled by the National Executive Board, from the list of names submitted by the remaining members of the Public Review Board." At oral argument counsel for the UFW pointed out that two current members of the Public Review Board are former members of the Board.

Commendable as the purpose and reputation of the Public Review Board may be, any agency which ultimately owes its existence and the designation of its membership to the union cannot be said to meet the *Chicago Teachers* requirement of "an impartial decisionmaker." At oral argument counsel for petitioners proposed neutral arbitration as an alternative. In *Chicago Teachers* the United States Supreme Court suggested that "an expeditious arbitration might satisfy the requirement of a reasonably prompt decision by an impartial decision maker, so long as the arbitrator's selection did not represent the Union's unrestricted choice." (475 U.S. at p. 308, fn. 21 [89 L.Ed.2d at p. 248].) A common mechanism is to authorize each of the parties to a bilateral dispute to select an arbitrator, and the two arbitrators thus selected to choose a third. Recognizing the practical difficulties a worker may encounter in attempting expeditiously to select a qualified arbitrator, we suggest it may be more satisfactory to provide that upon a worker's appeal the American Arbitration Association shall be called upon to designate a single neutral arbitrator of relevant qualifications and experience, to arbitrate the matter under the rules of the association and to be paid by the union. We anticipate that one properly conducted arbitration should suffice to resolve allocation issues for any given bargaining unit within any given fiscal year, so long as it is provided that every employee who objects during that fiscal year will receive the benefit of (and, correspondingly, will be bound by) the arbitrator's determination.

The decision and order should be modified accordingly.

*Constitutionality*

Because we conclude the approved settlement agreement does not meet *statutory* standards, we need not reach the question whether it would satisfy *constitutional* standards. (Cf. *Cumero* v. *Public Employment Relations Bd., supra,* 49 Cal.3d 575, 586; *Ellis* v. *Railway Clerks, supra,* 466 U.S. 435, 444-445 [80 L.Ed.2d 428, 439-440].)

*Union Calculations*

The record reflects that for purposes of implementing the approved settlement agreement the UFW calculated it had allocated 10.93 percent of

members' contributions to "activities or causes primarily political in nature," and would be prepared, upon receipt of an objection, to refund that proportion of an objecting member's contributions.

In their briefs petitioners argued that the UFW's calculation is insufficiently documented, and in any event cannot be applied to CPD pay inasmuch as (in petitioners' view) "CPD pay contributions are used *solely* to advance political activities."

Our decision contemplates that the guidelines and procedures by which the UFW prepared and disseminated its calculations will be superseded, as to both ordinary dues and CPD pay, by a new Board order. That order will moot petitioners' contention.

*Sanctions*

The UFW characterizes the petition in this court as "frivolous," and seeks money sanctions from petitioners. The analysis we have stated and the conclusions we have reached should make clear that we disagree with the UFW's characterization. The request for sanctions is denied.

The decision and order of the Agricultural Labor Relations Board in *United Farm Workers of America, AFL-CIO (Giles Breaux, et al.), supra,* 11 ALRB No. 32 is annulled. The matter is remanded to the Board for proceedings consistent with the views expressed in this opinion.

Cottle, Acting P. J., and Elia, J., concurred.